SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**388 Route 22 Readington Realty Holdings, LLC v. Township of Readington** (A-63-13) (073322)

**Argued December 2, 2014 – May 5, 2015**

**ALBIN, J., writing for a unanimous Court.**

In this appeal, the Court considers the circumstances under which a municipality may exercise its discretion to repurchase unused sewer capacity.

In December 2007, plaintiff purchased property in Readington Township (Township). The property is serviced by a septic tank with a capacity of up to 2000 gallons per day (gpd). The Township rezoned plaintiff's property from the Mixed-Use District to the Business District. Thereafter, plaintiff made plans to redevelop the property for use as a restaurant and other retail purposes. However, plaintiff's septic tank does not have sufficient capacity to process the wastewater generated by the uses plaintiff proposes.

In 1999, the Readington-Lebanon Sewerage Authority (Authority) began to expand its plant capacity to allow the treatment of an additional 320,000 gpd of the Township's wastewater. As a result of the expansion, the Township was allocated a total of 939,000 gpd of sewer capacity. The Township agreed to pay the Authority $6,024,704 for the increased capacity and relied on private investment to finance the project. Each landowner purchasing future sewer capacity entered into a sewer allocation agreement with the Township. The sample allocation agreement places a time limit on the right of a landowner to hold on to unused capacity and provides that the landowner pay a certain sum for unused sewer capacity annually. By ordinance, the Township provides the methodology for allocation of sewer capacity to landowners and for the recapturing of unused capacity. According to the ordinance, in the case of those development projects which have not received approval by the appropriate Township board having jurisdiction at the time a request for gallonage is made, allocation agreements shall provide that if the applicant does not make formal application to the appropriate Township board within two years of approval of the allocation, then the Township Committee may, in its discretion, terminate the agreement. The ordinance also provides that if within two years after preliminary approval, construction has not commenced, the Township Committee may, at its discretion, terminate the agreement.

Plaintiff requested that the Township recapture sufficient sewer capacity to allow its construction project to proceed. In response, the Township notified plaintiff that there was no sewer capacity available. Plaintiff filed a complaint against the Township and multiple private entities to compel the transfer of allocated, but unused, sewer capacity, claiming that the municipal ordinance addressing the allocation of sewer capacity was invalid either on its face or as applied by the Township. Plaintiff and defendants subsequently moved for summary judgment. The trial court remanded the matter to the Township Committee to review the reasoning set forth in its prior rejection of plaintiff's request for sewer capacity and to provide a statement of reasons as a supplement to its decision. In response to the remand order, the Township Committee held a public hearing and issued a resolution denying plaintiff's request for sewer capacity.

The trial court affirmed the validity of the ordinance, but determined that the Township's blanket policy of not recalling unused sewer capacity violated the dictates of this Court's decision in First Peoples Bank v. Township of Medford, 126 N.J. 413, 420-21 (1991). According to the trial court, the Township's obligation is not dependent on whether plaintiff can beg, borrow or cadge capacity from others, but rather to terminate agreements where it is appropriate to do so. As a remedy, the court ordered that the Township undertake, within ninety days, a review of the unused sewer capacity listed by plaintiff and provide a reasoned basis for not recapturing that capacity. Plaintiff and several defendants appealed, and in an unpublished opinion, the Appellate Division reversed. The Appellate Division agreed with the trial court that the Township relied on a policy of not re-taking sewer rights granted by contract, but also found that plaintiff could not overcome the presumption of validity that attaches to municipal decision-making. This Court granted plaintiff's petition for certification. 217 N.J. 287 (2014).

**HELD**: A blanket policy of not recapturing unused sewer capacity is the functional equivalent of a moratorium on development. The Court approves of the trial court's approach, requiring the Township both to undertake a detailed analysis of the unused capacity in the hands of private parties and to explain whether any of that capacity can be recalled.

1. The Court's primary task here is to resolve whether the Township's sewer allocation ordinance is facially valid and whether the ordinance as applied by the Township Committee constitutes an improper delegation of land-use authority to private parties in violation of First Peoples. The Legislature has the constitutional authority to delegate to municipalities the police power to enact ordinances governing the nature and extent of the uses of land and has done so through the passage of the Municipal Land Use Law (MLUL). This power, however, is not unlimited. Like all ordinances, the Township's sewer allocation ordinance is entitled to a presumption of validity, and the party challenging the ordinance bears the burden of overcoming that presumption. (pp. 29-31)

2. A sewer ordinance should withstand a challenge unless it is inequitable, unfair, or lacks adequate standards to insure the fair and reasonable exercise of municipal authority. In First Peoples, which addressed several of the issues presented here, Medford Township financed the expansion of its sewage plant through the sale of sewer permits that were available on an equal basis to all developers. There, the question was whether the ordinance articulated adequate standards to guide the exercise of municipal discretion when considering the repurchase of permits. This Court concluded that the ordinance, although not exquisitely drafted, contained sufficient standards to withstand the plaintiff's challenge and rejected the plaintiff's as-applied challenge to the ordinance, finding nothing to suggest that Medford had acted arbitrarily in deciding whether to exercise its repurchase option. (pp. 32-34)

3. With those principles in mind, the Court rejects plaintiff's challenge to the ordinance itself and finds that the Township's sewer allocation ordinance provides adequate standards to guide the exercise of municipal discretion when considering the repurchase of permits. The Court presumes that the ordinance's drafters intended certain practical considerations to be taken into account by the Township Committee in exercising its discretion whether to terminate an allocation agreement or extend one based on good cause. Such considerations would include (1) the length of time a landowner has possessed unused sewer capacity, (2) the development plans of the landowner to tap some or all of the unused capacity and the imminence of that happening, (3) the complexity of the development project and the importance of the project to the community, (4) whether the economy has retarded economic development, (5) proposed development projects by others that cannot proceed because of unavailability of sewer capacity and the importance of those projects to the community, and (6) any other relevant factors. As was true in First Peoples, the ordinance here was not exquisitely drafted. Nevertheless, it must be liberally construed in favor of its validity. This ordinance in no way suggests that the Township as a matter of law has delegated its authority to control land use, or access to sewer capacity, to private parties. The Court concludes that the sewer allocation ordinance provides adequate guidelines for the Township to exercise its discretion whether and when to repurchase sewer capacity. (pp. 35-37)

4. In contravention of its own ordinance, the Township maintains a blanket policy of not repurchasing unused sewer capacity allocated to developers. The fact that sewer capacity was allocated by contracts to private entities that financed the plant expansion project and was paid for at considerable expense cannot be the end of the analysis. Otherwise, the ordinance requiring the Township to exercise its discretion in recapturing sewer capacity would be meaningless. That other landowners did not participate in purchasing capacity to help finance the plant expansion may indicate nothing more than that they did not have a need for sewer capacity at the time. (pp. 37-39)

5. The Appellate Division placed on plaintiff the burden of showing that defendant developers were acting without good cause for delay by not voluntarily surrendering their sewer rights for the fair value offered by plaintiff. That defeats the purpose of the ordinance and of the policy of the MLUL, which is to have the Township exercise its decision-making authority in land-use matters. The resolution also failed to analyze which developments, if any, fall under the dictates of the Permit Extension Act, N.J.S.A. 40:55D-136.1 to -136.6. Last, and most significantly, the resolution did not give a reasoned explanation for the Township's failure to exercise discretion, as required by its own ordinance. As a best practice, the Court suggests that the Township maintain updated records of the unused capacity held by private parties so that it can exercise its discretion, when necessary, with current information. (pp. 39-42)

6. The Court orders the Township Committee, within ninety days, to undertake a critical review of the unused capacity identified by plaintiff and to determine whether any such capacity can be recaptured from defendants to satisfy plaintiff's development needs. (p. 42)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**. The matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE ALBIN'S opinion. JUSTICE LaVECCHIA and JUDGE CUFF (temporarily assigned) did not participate.**

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

    Plaintiff-Appellant,

        v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, READINGTON
COMMONS, LLC, C. DELVECCHIO,
S. CARBONE, A. CARBONE, ROLF
ACKERMAN, VALLEY NATIONAL
BANK, RYLAND DEVELOPERS, LLC,
LOT 3 DEVELOPMENT, LLC,
FALLONE PROPERTIES, LLC,
URB-FI DEVELOPMENT CORP.,
FALLONE AT SPRING MEADOW, LLC
COUNTRY CLASSICS LEGACY
READINGTON, and WINFIELD
MANAGEMENT,

    Defendants-Respondents,

        and

MERCK SHARP & DOHME CORP.,
f/k/a MERCK & CO., INC.,

    Defendant-Respondent,

        and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW

1

ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

     Defendants.

---

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

     Plaintiff-Appellant,

        v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON, MERCK
SHARP & DOHME CORP., f/k/a
MERCK & CO., INC., READINGTON
COMMONS, LLC, C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, RYLAND
DEVELOPERS, LLC, LOT 3
DEVELOPMENT, LLC, FALLONE
PROPERTIES, LLC, URB-FI
DEVELOPMENT CORP., FALLONE AT
SPRING MEADOW, LLC, COUNTRY
CLASSICS LEGACY READINGTON,
and WINFIELD MANAGEMENT,

     Defendants-Respondents,

        and

BELLEMEAD DEVELOPMENT
CORPORATION,

     Defendant-Respondent,

        and

2

RAMYZ TADROS, SHADIA SAMAAN, WHITEHOUSE ATHLETIC ASSOCIATION, WLADYSLAW ZACIOS, JOANN ZACIOS, BETTY ANN COEBLER, CODDINGTON HOMES CO., INC., TOM JR. PROPERTY, INC., and WPS REALTY, LLC,

    Defendants.

---

388 ROUTE 22 READINGTON REALTY HOLDINGS, LLC,

    Plaintiff-Appellant,

        v.

TOWNSHIP OF READINGTON, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF READINGTON, and SEWER ADVISORY COMMITTEE OF THE TOWNSHIP OF READINGTON,

    Defendants-Respondents,

        and

BELLEMEAD DEVELOPMENT CORPORATION, MERCK SHARP & DOHME CORP., f/k/a MERCK & CO., INC., READINGTON COMMONS, LLC, C. DELVECCHIO, SCOTT CARBONE, A. CARBONE, ROLF ACKERMAN, VALLEY NATIONAL BANK, RYLAND DEVELOPERS, LLC, LOT 3 DEVELOPMENT, LLC, FALLONE PROPERTIES, LLC, URB-FI DEVELOPMENT CORP., FALLONE AT SPRING MEADOW, LLC COUNTRY CLASSICS LEGACY READINGTON, and WINFIELD MANAGEMENT,

    Defendants-Respondents,

and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

Defendants.

---

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

Plaintiff-Appellant,

v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, MERCK SHARP &
DOHME CORP., f/k/a MERCK &
CO., INC., C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, RYLAND
DEVELOPERS, LLC, LOT 3
DEVELOPMENT, LLC, FALLONE
PROPERTIES, LLC, URB-FI
DEVELOPMENT CORP., TOLL NJ I,
LLC, and WINFIELD MANAGEMENT,

Defendants-Respondents,

and

COUNTRY CLASSICS LEGACY AT
READINGTON, READINGTON
COMMONS, LLC, and RYLAND
DEVELOPERS, LLC,

4

Defendants-Respondents,

and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

Defendants.

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

Plaintiff-Appellant,

v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, MERCK SHARP &
DOHME CORP., f/k/a MERCK &
CO., INC., READINGTON
COMMONS, LLC, C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, RYLAND
DEVELOPERS, LLC, FALLONE
PROPERTIES, LLC, URB-FI
DEVELOPMENT CORP., FALLONE AT
SPRING MEADOW, LLC, and
COUNTRY CLASSICS LEGACY
READINGTON,

Defendants-Respondents,

and

5

LOT 3 DEVELOPMENT, LLC and
WINFIELD MANAGEMENT,

      Defendants-Respondents,

        and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

      Defendants.

---

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

      Plaintiff-Appellant,

        v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, MERCK SHARP &
DOHME CORP., f/k/a MERCK &
CO., INC., READINGTON
COMMONS, LLC, C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, LOT 3
DEVELOPMENT, LLC, FALLONE
PROPERTIES, LLC, URB-FI
DEVELOPMENT CORP., FALLONE AT
SPRING MEADOW, LLC, COUNTRY
CLASSICS LEGACY READINGTON,
and WINFIELD MANAGEMENT,

      Defendants-Respondents,

and

RYLAND DEVELOPERS, LLC,

    Defendant-Respondent,


and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

    Defendants.

---

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

    Plaintiff-Appellant,

       v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, MERCK SHARP &
DOHME CORP., f/k/a MERCK &
CO., INC., READINGTON
COMMONS, LLC, C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, RYLAND
DEVELOPERS, LLC, LOT 3
DEVELOPMENT, LLC, URB-FI
DEVELOPMENT CORP., COUNTRY
CLASSICS LEGACY READINGTON,
and WINFIELD MANAGEMENT,

    Defendants-Respondents,

7

and

FALLONE PROPERTIES, LLC, and
TOLL NJ I, LLC,

    Defendants-Respondents,

    and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

    Defendants.

---

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

    Plaintiff-Appellant,

      v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF THE
TOWNSHIP OF READINGTON, SEWER
ADVISORY COMMITTEE OF THE
TOWNSHIP OF READINGTON,
BELLEMEAD DEVELOPMENT
CORPORATION, MERCK SHARP &
DOHME CORP., f/k/a MERCK &
CO., INC., READINGTON
COMMONS, LLC, C. DELVECCHIO,
SCOTT CARBONE, A. CARBONE,
ROLF ACKERMAN, VALLEY
NATIONAL BANK, RYLAND
DEVELOPERS, LLC, FALLONE
PROPERTIES, LLC, URB-FI
DEVELOPMENT CORP., FALLONE AT
SPRING MEADOW, LLC, and
COUNTRY CLASSICS LEGACY
READINGTON,

Defendants-Respondents,

and


LOT 3 DEVELOPMENT, LLC, and
WINFIELD MANAGEMENT,

Defendants-Respondents,

and

RAMYZ TADROS, SHADIA SAMAAN,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS, BETTY
ANN COEBLER, CODDINGTON HOMES
CO., INC., TOM JR. PROPERTY,
INC., and WPS REALTY, LLC,

Defendants.


Argued December 2, 2014 – Decided May 5, 2015

On certification to the Superior Court,
Appellate Division.

Lawrence S. Berger argued the cause for
appellant (Berger & Bornstein, attorneys).

Christopher John Stracco argued the cause
for respondent Merck Sharp & Dohme Corp.
(Day Pitney, attorneys; Mr. Stracco and
Jennifer Gorga Capone, on the brief).

Robert A. Ballard argued the cause for
respondents Township of Readington, Township
Committee of the Township of Readington, and
Sewer Advisory Committee of the Township of
Readington, (Ballard & Dragan, attorneys).

Glenn S. Pantel argued the cause for
respondent Bellemead Development Corporation

9

(Drinker Biddle & Reath, attorneys; Mr. Pantel and Karen A. Denys, on the brief).

Deborah B. Rosenthal argued the cause for respondents Winfield Management Corp. and Lot 3 Development, LLC (Gebhardt & Kiefer, attorneys; Robert C. Ward, on the brief).

Alexander G. Fisher argued the cause for respondents Ryland Developers, LLC, Readington Commons, LLC and Country Classics Legacy at Readington, LLC (Mauro, Savo, Camerino, Grant & Schalk, attorneys).

Thomas W. Sweet argued the cause for respondents Fallone Properties, LLC and Fallone at Spring Meadow, LLC.

Salvatore Alfieri submitted a letter in lieu of brief on behalf of respondents Scott Carbone, A. Carbone, and C. DelVecchio (Cleary Giacobbe Alfieri Jacobs, attorneys).

JUSTICE ALBIN delivered the opinion of the Court.

Access to sewer service is vital to any major development of property. In First Peoples Bank v. Township of Medford, we held that a municipality cannot delegate the exercise of its land-use authority to private parties by allowing them to purchase and hoard unused sewer rights, thereby stifling development by those who are prepared to build. 126 N.J. 413, 420-21 (1991). Instead, a "[t]ownship must retain sufficient control to assure that sewer permits are either used or repurchased so that others may use them." Id. at 420.

Plaintiff 388 Route 22 Readington Realty Holdings, LLC is seeking to construct a retail outlet and a restaurant but cannot

10

do so unless it secures access to 11,260 gallons per day (gpd) of sewer capacity. At the time that plaintiff requested access to that amount of sewer capacity from Readington Township, approximately twenty private entities possessed 322,009 gpd of unused capacity. The Township sold most of that unused capacity on the private market as a means of financing the expansion of sewer service from the Readington-Lebanon Sewerage Authority (Sewerage Authority or Authority).

Plaintiff demanded that the Township -- in accordance with a municipal ordinance governing allocation of sewer rights -- recapture sufficient sewer capacity to allow its construction project to proceed. Consistent with its policy of not repurchasing capacity, the Township declined to do so. Plaintiff then filed a complaint in lieu of prerogative writs against the Township and multiple private entities to compel the transfer of allocated but unused sewer capacity. Plaintiff claimed that the municipal ordinance addressing the allocation of sewer capacity was invalid either on its face or as applied by the Township.

On cross-motions for summary judgment by the parties, the trial court affirmed the validity of the ordinance. The court, however, determined that the Township's blanket policy of not recalling unused sewer capacity violated the dictates of First Peoples. The court issued a writ of mandamus ordering the

11

Township to exercise its discretion under its ordinance and to provide "a reasoned basis for refusing to recapture" the unused capacity held by multiple private entities.

The Appellate Division reversed. Although the Appellate Division agreed with the trial court that the Township "simply relied on a policy of not re-taking sewer rights granted by contract," it concluded that plaintiff could not overcome the presumption of validity that attaches to municipal decision-making.

We now conclude that the Appellate Division erred. As the trial court held, the Township cannot meaningfully exercise its discretion whether to repurchase sewer capacity unless it examines the reasons given by each entity for not using capacity assigned to it. A policy of not recapturing unused sewer capacity is the functional equivalent of a moratorium on development. We approve of the sound approach taken by the trial court, requiring the Township both to undertake a detailed analysis of the unused capacity in the hands of private parties and to explain whether any of that capacity can be recalled.

I.

We now review the relevant parts of the record on the summary-judgment motions.

In December 2007, plaintiff purchased property and a warehouse located at 388 Route 22 West in Readington Township.

12

The wastewater at that site is serviced by a septic tank that allows for a maximum of 2000 gpd of capacity.[1]  The Township rezoned plaintiff's property from the Mixed-Use District to the Business District, where retail and restaurant uses are permitted.  Plaintiff's septic tank does not have sufficient capability to process the wastewater generated for the uses plaintiff proposes.

Plaintiff's property is in an area serviced by the Sewerage Authority, which manages wastewater for Readington and Lebanon Townships.  A sewer line is located directly in front of plaintiff's property.  After the zoning change, plaintiff made plans to redevelop the property for use as a restaurant and for other retail purposes.  Plaintiff's proposed project requires 11,260 gpd of sewer capacity, which can only be accomplished by connecting to the Authority's sewer system.  However, the Township advised plaintiff that there was no available sewer capacity to allocate to the project.

Around 1999, the Sewerage Authority began the expansion of its plant capacity to allow the treatment of an additional 320,000 gpd of Readington's wastewater.  As a result of the plant expansion, Readington Township was allocated, in all,

_____

[1] N.J.A.C. 7:9A-1.8 prohibits the use of a septic system to manage a wastewater capacity of over 2000 gpd without permission from the New Jersey Department of Environmental Protection.

13

approximately 939,000 gpd of sewer capacity.  The Township agreed to pay the Authority $6,024,704 for the increased capacity.  To finance the project, the Township relied on private investment.  The Township offered landowners the opportunity to purchase portions of the 320,000 gpd of increased capacity.  In response to the offering, to name a few, Merck Sharpe & Dohme Corporation purchased 141,900 gpd of capacity for $2,196,764, Bellemead Development Corporation purchased 58,746 gpd of capacity for $1,106,187, and Readington Commons, LLC purchased 7628 gpd of capacity for $143,635.  The prior owner of plaintiff's property declined to invest in future sewer capacity.

Each landowner purchasing future sewer capacity entered into a sewer allocation agreement with the Township.  The Township's "Sample Sewer Allocation Agreement," in part, provides:

> Should Developer not begin construction on the aforementioned properties within two (2) years of the date of this agreement, then the Township shall have the option to terminate this agreement and all capacity assigned herein under shall be returned to the Township for reallocation at the discretion of the Township.

The sample allocation agreement -- in compliance with the sewer allocation ordinance -- places a temporal limit on the right of a landowner to hold on to unused capacity.

14

The allocation agreements with Merck, however, do not follow the protocols in the ordinance or sample allocation agreement. Merck's 2003 and amended 2008 sewer allocation agreements allow Merck to maintain unused sewer capacity for the periods the Township extended Merck's site plan approvals for proposed construction in Readington. A past approval ran from 1988 to 2008, and the current approval runs from 2008 to 2018. Merck's agreements have barred the Township from recapturing unused capacity for a period lasting at least fifteen years.[2]

The typical allocation agreement provides that the landowner pay a certain sum for unused sewer capacity annually. The full annual amount was due the third year after acquisition. The first and second year payments were set at one-third and then two-thirds of the full amount annually due. For example, Merck agreed to pay $48,720 the first year, $97,440 the second year, and then $146,160 annually for as long as the allocated gallonage remained unused.

---

[2] In 1988, Merck obtained preliminary site plan approvals for projects to be constructed on its Readington property. The approvals were set to expire in twenty years. In 2008, Readington granted Merck a ten-year extension of its preliminary site plan approvals, and the Township agreed that it would not seek to recapture any unused sewer capacity until 2018.

15

As of December 2010, of the 322,009 gpd of unused capacity, 141,900 was held by Merck, 66,060 by Bellemead,[3] 32,000 or 38,860 by Fallone Properties, LLC, and 30,125 by Ryland Developers, LLC. Each remaining defendant held less than 10,000 gpd of unused capacity. Merck's unused capacity represents forty-four percent of the entire capacity yielded from Readington's portion of the Authority's plant expansion.

Defendants have not proceeded with construction projects for a variety of reasons. One reason given by some defendants has been the downturn in the economy.

By ordinance, the Township provides the methodology for allocation of sewer capacity to landowners and for the recapturing of unused capacity. Readington Township Code § 187-26 states:

> A. Order of priority; reserves.
>
> > (1) By existing joint agreement with the Readington Lebanon Sewerage Authority, the Township of Readington has a total sewer allocation of 935,000 gpd. Upon study by the Township, there is a limited amount of sewer capacity in Readington

---

[3] In 1988, Bellemead was granted preliminary and final site plan approval for its "Halls Mills Farm" development project. The approval was set to expire in eight years. Bellemead was granted multiple extensions with the final extension set to expire in July 2010. As a result of the Authority's plant expansion, Bellemead was allocated 58,746 gpd of capacity, making its total capacity 110,746 gpd. Bellemead is using 44,686 of that gallonage, while 66,060 gpd -- the amount required to operate its Halls Mills project -- remains unused.

16

Township at the present time. Any remaining capacity from Readington's portion of its allotted capacity in the Readington Lebanon Sewerage Authority sewer service area shall be allocated in the following order of priority, subject to availability:

(a) First, to those projects which will enable the Township to meet its future Mount Laurel affordable housing obligations; and

(b) Secondly, to remedy those properties within the sewer service area which constitute an "emergency" due to failing septic systems.

(2) The Township reserves the right to keep that portion of sewerage capacity needed for "reserve" to meet NJDEP requirements.

B. Allocations for sewer capacity from Readington's allotted portion of sewer capacity shall be made by the Readington Township Committee upon written agreement to be entered into with the applicant, after the allocation request has been reviewed and a favorable recommendation has been made by the Readington Township Sewer Advisory Committee.

C. In the case of those development projects which have not received an approval by the appropriate township board having jurisdiction at the time a request for gallonage is made, allocation agreements shall provide that if the applicant does not make formal application to the appropriate township board within two years of approval of the allocation, then the Township Committee may, in its discretion, terminate the agreement. If within two years after preliminary approval, construction has not commenced, the Township Committee may, at its discretion, terminate the agreement. The agreement may be

17

extended upon application to the Township if there is a showing of good cause, at the option of the Township Committee.

D. Applicants who received capacity allocations under this section shall enter into a sewer plant expansion developer contribution agreement which is intended to cover the Township's share of the portion of the costs of expanding the [Sewerage Authority] treatment plant until such time as those costs have been satisfied. . . .

E. Allocation of sewer capacity may not be transferred from the owner without prior approval of the Readington Township Committee, upon review and recommendation of the Readington Township Sewer Advisory Committee.

In March 2010, plaintiff wrote to the Readington Township Committee and the Readington Sewer Advisory Committee requesting that 388 Route 22 be permitted to hook up to the Authority's sewer system and gain access to approximately 10,000 gpd capacity. Plaintiff expressed its belief that the Township possessed sufficient sewer capacity to accommodate plaintiff's request. Alternatively, in the event that all sewer capacity had been allocated, plaintiff stated that Readington should buy back unused capacity from property owners who had "not made formal application for development of [their] properties" or who had "failed to commence construction of improvements within two years after receipt of preliminary approval from the appropriate Township Board." In making this demand for the buyback of unused capacity, plaintiff relied on paragraph C of the

18

Readington Township sewer allocation ordinance. The Readington Township Committee replied that it did "not wish to terminate any of its existing sewer agreements."

On August 4, 2010, plaintiff's attorney and professional planner appeared before the Readington Sewer Advisory Committee, describing plaintiff's plan to develop the property at 388 Route 22 into retail space and a restaurant. They requested a hookup to the sewer system and 11,260 gpd of wastewater capacity. The Committee's chairman replied that all capacity was either used or reserved by property owners who financed the sewer plant's expansion. He stated that the Township was bound by contracts with those property owners, although the ordinance allowed for an owner to "voluntarily" give up capacity. The chairman made clear that "the policy of this board and the policy of the Township Committee has been not to take any capacity back." The chairman finally noted that his committee's recommendation was advisory and that the Township Committee would make the final decision.

On September 20, 2010, plaintiff's attorney appeared before the Township Committee and requested 11,260 gpd of sewer capacity for plaintiff's project. He indicated that plaintiff had contacted fifteen property owners, and none were interested in selling their unused capacity. The attorney noted that plaintiff would pay the holder its costs in acquiring and

retaining the unused capacity.  Nevertheless, Committee members expressed concern about breaching contracts with landowners holding unused capacity.

By letter dated October 14, 2010, the Township Committee advised plaintiff that there was no sewer capacity available. The Committee invited plaintiff to present "a conceptual plan, either through the Planning Board or Board of Adjustment, whichever is applicable, . . . and that the application would be conditioned on obtaining a suitable solution to wastewater."

## II.

## A.

In November 2010, plaintiff filed its lawsuit seeking an order compelling the Township to recapture 11,260 gpd of unused sewer capacity for its project.  Plaintiff's complaint in lieu of prerogative writs named as defendants Readington Township, Bellemead, Merck, Readington Commons, and various other parties listed in the caption.  Among plaintiff's claims are the following:  (1) as a result of Readington Township's sewer allocation ordinance, the Township has failed to retain control over the allocation of sewer capacity and, in effect, has delegated to certain private landowners the authority to prevent other property owners from developing their land; (2) the Township's policy of not recapturing sewer capacity in the hands of private entities is arbitrary, capricious, and unreasonable

20

under the ordinance; (3) the "Township has sufficient unused capacity to allocate to [p]laintiff's [p]roperty"; and (4) the Township's failure to allocate to plaintiff sewer capacity amounts to an unconstitutional taking of its property. Plaintiff's claims, in essence, constitute a facial and as-applied challenge to the validity of the municipal ordinance.

Plaintiff and defendants moved for summary judgment. The trial court -- the Honorable Peter A. Buchsbaum, J.S.C. -- remanded the matter to the Township Committee to "review the reasoning set forth in its prior rejection" of plaintiff's request for sewer capacity and to "provide a statement of reasons as a supplement to its decision."

In response to the remand order, the Township Committee held a public hearing on July 5, 2011 and issued a resolution denying plaintiff's request for sewer capacity. The resolution referenced letters received from defendants Merck, Readington Commons, Bellemead, Fallone, and Urb-Fi Development Corp., which recited their allocation agreements with the Township and described the development status of their projects. Those and other defendants objected to the transfer of any of their unused capacity to plaintiff.

In justifying its refusal to recapture unused sewer capacity, the Township Committee adopted in the resolution "the full contents and arguments of the listed correspondence

21

submitted by various defendants."  The Township Committee gave further reasons for the denial of plaintiff's request:  (1) all excess capacity held by the Township is reserved for affordable housing and emergencies; (2) the sewer ordinance allowed the Township to extend its sewer allocation agreements with defendants for "good cause" and, having done so, the Township did not act unreasonably or arbitrarily; (3) several defendants "have development approvals which fall under the protections afforded by the Permit Extension act," a separate reason constituting "good cause" for continuing the allocation agreements; (4) the previous owner of plaintiff's property expressed no "interest in acquiring sewer capacity at the time the Township announced that it was available for purchase"; (5) Township Committee members did not believe that it was "in the public interest to force the termination of . . . existing sewer agreements"; and (6) plaintiff had not determined whether the holder of any unused capacity had an "interest in voluntarily selling their capacity back to the Township."

B.

The trial court held that Readington's sewer ordinance passed muster under First Peoples, supra, 126 N.J. 413.  In a written opinion, the court determined that the ordinance, on its face, ensures "municipal control of sewer rights" and "provides mechanisms" for the Township "to recapture sewer capacity."  In

22

reaching this decision, the court recognized "the tradition of judicial deference" in upholding "broad standards for local action in the land use area."

On the other hand, the court found that the ordinance as applied by the Township raised serious doubts about the legitimacy of the Township's sewer policy. Based on the summary-judgment record, it accepted that plaintiff was unsuccessful in its efforts to purchase sewer capacity from defendant developers and that the policy of the Township, as expressed by the Chairman of the Sewer Advisory Committee, "is not to take capacity back." The court described the Township's resolution as "pro forma" and a "brushoff" that "simply recites what was received from [defendants'] counsel." The resolution failed to "contain a development by development analysis" or to provide "a reasoned explanation" for the Township's decision not "to exercise discretion" to recapture any of the unused capacity, which constituted one third of the entire flow allocated to Readington. Further, the resolution failed to analyze whether the Permit Extension Act, N.J.S.A. 40:55D-136.1 to -136.6, applied "to each and every development." The court held that "the ordinance requires the exercise of discretion," yet the Township followed a "flat policy" of refusing to assert its right to recapture unused capacity. It construed First Peoples as standing for the proposition that sewer rights

23

"cannot be held in perpetuity" and that at some point the Township has a duty to recapture unused capacity.

According to the trial court, the Township's obligation is not dependent on whether plaintiff can "beg, borrow or cadge capacity from others" but rather "to terminate agreements where it is appropriate to do so." It found that the Township's no-buy-back policy "functioned as a <u>de facto</u> moratorium on any development which requires sewerage."

As a remedy, the court ordered that the Township undertake, within ninety days, a review of the unused sewer capacity listed by plaintiff and provide "a reasoned basis" for not recapturing that capacity."[4] It cautioned that agreements between the Township and defendants granting extended sewer rights may not control when a present holder of capacity has seemingly reserved the right indefinitely and a "party seeking sewer allocation is ready to imminently make use of those rights." The court acknowledged, however, that the application of the Permit Extension Act might limit the Township's discretion.

Plaintiff and several defendants appealed.

C.

---

[4] The court excepted from the order defendants Country Classics of Readington and Readington Commons because they evidently are using their capacity.

24

In an unpublished opinion, the Appellate Division affirmed the Law Division's rejection of plaintiff's facial challenge to the ordinance but reversed the Law Division's finding that the Township Committee did not give a reasoned basis for not recapturing sewer capacity for plaintiff's project.

Like the trial court, the appellate panel was satisfied that the ordinance provided "standards sufficient to insure 'fair and reasonable exercise' of the discretion granted," quoting First Peoples, supra, 126 N.J. at 419. Nevertheless, the panel suggested that the Township follow the guidance offered in First Peoples and consider whether the Township and property owners would be better served if the ordinance gave "'more specific standards defining the conditions under which' good cause for extension will and will not be found, and procedural requirements applicants interested in repurchase should follow," quoting id. at 423.

The panel, however, determined that the Township Committee did not abuse its discretion in not recapturing unused sewer capacity for plaintiff. The panel described plaintiff's development plan as "at best speculative" and "vague." Although the panel acknowledged that the Township "Committee simply relied on a policy of not re-taking sewer rights granted by contract," it concluded that plaintiff did not "establish that the denial of its request was arbitrary because it failed to

25

overcome the presumption of validity to which the decision is entitled." The panel based its conclusion on the fact that defendants paid a "great expense" for their sewer rights and that plaintiff failed to identify those who were holding unused sewer capacity "without good cause for delay." The panel also faulted plaintiff for its "preference for litigation or settlement over development and presentation of a more definitive request." Last, the panel declined to rule on whether the sewer allocation agreements are protected under the Permit Extension Act.

We granted plaintiff's petition for certification. 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 217 N.J. 287 (2014).

III.

A.

Plaintiff advances several arguments: (1) the sewer allocation ordinance is invalid because it does not set forth adequate standards to guide the Township in determining when unused sewer capacity should be recaptured; (2) the Township's blanket refusal to recall unused sewer capacity violates principles set forth in First Peoples, amounts to an unconstitutional delegation of governmental authority over land use into the hands of private parties, and constitutes an unlawful moratorium on development; and (3) the Appellate

26

Division mistakenly ratified the Township's policy on the erroneous grounds that plaintiff "should have presented a more definitive plan for its proposed development," the holders of sewer rights expended considerable money to acquire the allocated capacity, and the Permit Extension Act expresses the Legislature's view that sewer agreements should be extended in periods of economic downturn. With regard to the last of those points, plaintiff emphasizes that developers who paid for allocations of sewer capacity did so "with full knowledge of the recapture rights of the Township under the Ordinance which, in many, if not all, instances, were embodied in the allocation agreements themselves." Plaintiff also maintains that neither the Township nor any court has determined whether any particular sewer allocation attached to a development project is protected by the Permit Extension Act. Last, plaintiff contends that the Appellate Division erred by dismissing its claim that the Township has understated its available capacity -- a claim that has never been adjudicated.

### B.

Defendants individually and collectively urge this Court to affirm the Appellate Division. First, they submit that the sewer allocation ordinance is valid on its face for the reasons given by the Appellate Division: the ordinance allows the Township to terminate or extend allocation agreements for good

27

cause, grants the Township authority over the transfer of sewer rights, sets benchmarks for the recapture of capacity, and establishes an order of priority for allocating available capacity.

Defendants also maintain that the Township Committee did not act unreasonably or arbitrarily in declining to recall sewer capacity allocated to property owners who funded the sewer plant expansion, who have approved site plans, and who paid and continue to pay for reserved capacity. Defendants emphasize that plaintiff had purchased 388 Route 22 with notice that sewer capacity was unavailable, had no definitive plan to develop the property, and made no application for land-use approvals.

Defendants contend that the Township rightly relied on the policy objective of "the Permit Extension Act as well as the explicit protections afforded by the Act in finding good cause to extend and not recapture the sewer allocations," particularly given the downturn in the economy that stalled development projects. Defendant Merck, in particular, claims that the Township is bound to honor its contractual obligations and that an impairment of those obligations would violate its rights. Merck points out that its agreement bars the Township from recalling sewer capacity before Merck's site plan approvals expire in 2018. Merck maintains that any recapture of its "unused sewer capacity prior to that time would unlawfully

28

vitiate Merck's site plan approvals, resulting not only in a breach of its contracts with the Township, but also an unconstitutional taking."

Finally, various defendants represent that they are currently using or in the process of using their allocated sewer capacity because their projects are either completed or underway.

IV.

A.

Our primary task here is to resolve issues of law: whether the Readington sewer allocation ordinance is facially valid, and whether the ordinance as applied by the Township Committee constitutes an improper delegation of land-use authority to private parties in violation of First Peoples. In construing the meaning of a statute, an ordinance, or our case law, our review is de novo. Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 535 (2013). "We need not defer to the trial court or Appellate Division's interpretative conclusions" unless they are correct. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012).

This appeal comes to us from a grant of summary judgment in favor of defendants, resulting in a dismissal of plaintiff's action in lieu of prerogative writs. In this procedural posture, plaintiff, as the non-moving party, is entitled to "the

29

benefit of all favorable evidence and inferences presented in the record before us." Murray, supra, 210 N.J. at 584-85; see also Gormley v. Wood-El, 218 N.J. 72, 86 (2014) ("A court should grant summary judgment only when the record reveals 'no genuine issue as to any material fact' and 'the moving party is entitled to a judgment or order as a matter of law.'" (quoting R. 4:46-2(c))). Accordingly, the summary-judgment record must be viewed "through the prism of [plaintiff's] best case." Gormley, supra, 218 N.J. at 86.

With those principles in mind, we begin with a review of the law that controls the distribution of sewer rights.

B.

The Legislature has the constitutional authority to delegate to municipalities the "police power" to enact ordinances governing "the nature and extent of the uses of land," N.J. Const. art. IV, § 6, ¶ 2, and the Legislature has done so through the passage of the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. The constitutional power delegated to municipalities to enact land-use regulations, however, is not unlimited. That power "must be exercised for the general welfare," and "regulations that conflict with the general welfare . . . are unconstitutional." S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mt. Laurel, 92 N.J. 158, 208 (1983) (Mt. Laurel II); see also S. Burlington Cnty. N.A.A.C.P. v. Twp.

30

of Mt. Laurel, 67 N.J. 151, 175 (1975) (Mt. Laurel I) (noting that police power exercised by municipality must promote "the general welfare"). Consistent with this fundamental tenet, one of the express purposes of the MLUL -- indeed the first enumerated purpose -- is "[t]o encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." N.J.S.A. 40:55D-2(a).

Like all ordinances, Readington's sewer allocation ordinance is entitled to a presumption of validity, and the "party challenging the ordinance bears the burden of overcoming that presumption." See Rumson Estates, Inc. v. Mayor & Council of Fair Haven, 177 N.J. 338, 350 (2003). An ordinance must be "'liberally construed'" in favor of its validity. Id. at 351 (quoting N.J. Const. art. IV, § 7, ¶ 11). Our charge is to pass not on the wisdom of a municipal ordinance, but only on whether it complies with the Constitution and the MLUL. See ibid.

Courts must also pay deference to the decision-making of municipal bodies, recognizing that they possess "peculiar knowledge of local conditions [and] must be allowed wide latitude in the exercise of delegated discretion." Kramer v. Bd. of Adjustment, 45 N.J. 268, 296 (1965). A municipal land-use determination should not be set aside unless the public body has engaged in "a clear abuse of discretion." Id. at 296-97.

31

If there is "substantial evidence to support" the municipal decision, a court should not interfere by substituting its judgment.  Id. at 296.

Specific to this case, "a sewer ordinance should withstand a challenge unless it is inequitable, unfair, or lacks adequate standards to insure the fair and reasonable exercise of municipal authority."  First Peoples, supra, 126 N.J. at 419 (citing 5 McQuillin, The Law of Municipal Corporations § 18.12 at 453 (3d ed. 1989)).  Nevertheless, "[t]he municipal obligation is to provide a level playing field so that applicants are treated equally."  Ibid.

In assessing the validity of Readington's sewer ordinance and the Township's application of that ordinance, we are not addressing novel issues.  We are returning to issues that we reviewed in First Peoples, and therefore a discussion of that case will help guide us here.

In First Peoples, Medford Township financed the expansion of its sewage plant through the sale of sewer permits that were available on an equal basis to all developers.  Id. at 415-17.  Medford's sewer ordinance gave property owners "the option to purchase connection permits before obtaining municipal land use approvals."  Id. at 416.  The plaintiff bank declined the opportunity to do so.  Id. at 417.  Later, when the plaintiff wanted to develop its property, its request for several sewer

32

permits was denied because all permits had been allocated.  Id.
at 418.  The plaintiff then instituted a lawsuit, challenging
the validity of the ordinance and seeking an order directing
Medford to repurchase unused permits.[5]  Ibid.

Our focus in First Peoples was whether the ordinance
articulated "adequate standards to guide the exercise of
municipal discretion when considering the repurchase of
permits."  Id. at 421.  Ultimately, we concluded that the
"ordinance, although not exquisitely drafted, contain[ed]
sufficient standards to withstand the [plaintiff's] challenge."
Id. at 422.  We gleaned from various clauses of the ordinance,
including one that provided that "reservation of capacity is not
irrevocably committed to a proposed user," that Medford "when
exercising its right of repurchase, must consider the public
health, safety, and welfare, a reasonable and equitable
allocation of costs, and the allowance of moderate growth."  Id.
at 422-23.  Importantly, we considered Medford's sewer ordinance
to be far from a model ordinance.  Id. at 423.  We stated that

> it would better serve both the Township and
> property owners if it contained more specific
> standards defining the conditions under which
> permits would be subject to repurchase.  Such
> standards could appropriately include the
> criteria the municipality will apply when
> exercising its rights to repurchase permits

---

[5] The plaintiff also unsuccessfully sought an order requiring
Medford to expand the capacity of the sewage plant.  Id. at 418,
423-24.

and a formula for more closely correlating the issuance of building permits and sewer permits. In the absence of such standards, the municipality runs the risk that in another case the ordinance might be found vulnerable as applied.

[Ibid.]

Significantly, in First Peoples, no one disputed that "the Township must retain sufficient control to assure that sewer permits are either used or repurchased so that others may use them." Id. at 420. We declared that "[w]ithout an adequate repurchase provision, the ordinance could result in the improper delegation of access to the sewer system to private landowners who, by purchasing permits, could prevent other owners from developing their land." Id. at 420-21.

We nevertheless rejected the plaintiff's as-applied challenge to the ordinance, finding nothing to suggest that Medford had "acted arbitrarily in deciding whether to exercise its repurchase option." Id. at 423. We specifically noted that Medford "had repurchased approximately fifteen permits and that it was considering the repurchase of others," and that the record did not indicate that the plaintiff "had made demand on Medford to repurchase specific permits." Ibid. For those reasons, we viewed the plaintiff's "attack on the repurchase provision as essentially facial." Ibid.

34

With those principles in mind, we now turn first to the facial challenge to Readington's sewer allocation ordinance and then its application of the ordinance to this case.

V.

A.

We reject plaintiff's challenge to the ordinance itself. We find that Readington's sewer allocation ordinance provides "adequate standards to guide the exercise of municipal discretion when considering the repurchase of permits." First Peoples, supra, 126 N.J. at 421.

First, the ordinance sets temporal limits on the right of a property owner to keep unused sewer capacity. The Township has the discretion to terminate an allocation agreement and repurchase capacity if a developer (1) does not make application for development approvals within two years of having received sewer capacity or (2) has not begun construction within two years after having received preliminary approval. Readington Code, supra, § 187-26C. Second, the ordinance provides that an allocation agreement "may be extended upon application to the Township if there is a showing of good cause, at the option of the Township Committee." Ibid.

As was true in First Peoples, supra, the ordinance here was not "exquisitely drafted." See 126 N.J. at 422. Nevertheless, we must "'liberally construe[]'" the ordinance in favor of its

35

validity.  Rumson Estates, supra, 177 N.J. at 351 (quoting N.J. Const. art. IV, § 7, ¶ 11).  We presume that the ordinance's drafters intended certain practical considerations to be taken into account by the Township Committee in exercising its discretion whether to terminate an allocation agreement or extend one based on good cause.  Such considerations would include (1) the length of time a landowner has possessed unused sewer capacity, (2) the development plans of the landowner to tap some or all of the unused capacity and the imminence of that happening, (3) the complexity of the development project and the importance of the project to the community, (4) whether the economy has retarded economic development, (5) proposed development projects by others that cannot proceed because of unavailability of sewer capacity and the importance of those projects to the community, and (6) any other relevant factors.

Plans for the treatment of wastewater is a critical component of any development project, for without sewer approval no development project can go forward.  Field v. Franklin Twp., 190 N.J. Super. 326, 328-35 (App. Div.), certif. denied., 95 N.J. 183 (1983).  This ordinance, as written, in no way suggests that the Township as a matter of law has delegated its authority to control land use -- and more specifically to control access to sewer capacity -- to private parties.  The ordinance suggests

that access to sewer capacity is to be managed by the Township Committee for the general welfare of the community.

We conclude that the sewer allocation ordinance -- when read with the commonsense considerations implied within the enactment -- provides adequate guidelines for the Township to exercise its discretion whether and when to repurchase sewer capacity.

We next turn to plaintiff's argument that the ordinance, as applied, violates the dictates of First Peoples.

B.

In First Peoples, supra, we did not find evidence that Medford had acted arbitrarily in deciding whether to exercise its option to repurchase sewer capacity. 126 N.J. at 423. That was so because the "Township had repurchased approximately fifteen permits" and "was considering the repurchase of others" and because the plaintiff had not demanded that Medford "repurchase specific permits." Ibid. We noted that had Medford acted arbitrarily, "a court might direct it to exercise its option to repurchase." Ibid. That scenario, envisioned by our Court, presents itself here.

Based on the summary-judgment record before us, it is apparent that, despite its ordinance, Readington maintains a blanket policy of not repurchasing unused sewer capacity allocated to developers. The Chairman of the Sewer Advisory

37

Committee told plaintiff's attorney that "the policy of this board and the policy of the Township Committee has been not to take any capacity back." The Chairman's statement reinforced the Township attorney's earlier communication to plaintiff that the Township Committee did "not wish to terminate any of its existing agreements."

Approximately one-third of Readington's entire sewer capacity -- 322,009 gpd -- is not in use. That unused capacity is largely in the hands of a relatively small number of private entities. Currently, Merck has 141,900 gpd and Bellemead has 66,060 gpd of unused sewer capacity -- capacity allocated for more than a decade but still not in use. Both companies received approvals for their development projects in the late 1980s. That sewer capacity was allocated by contracts to private entities that financed the plant expansion project and was paid for at considerable expense cannot be the end of the analysis. Otherwise, the ordinance requiring Readington to exercise its discretion in recapturing sewer capacity would be meaningless. Those entities that purchased unused capacity did so knowing that the ordinance placed potential temporal limits on how long that capacity could be held in reserve and gave the Township the authority to recapture unused capacity for distribution to developers with projects ready to go. The ordinance made clear that sewer rights were not to be held in

38

perpetuity.  That other landowners did not participate in purchasing capacity to help finance the plant expansion may indicate nothing more than that they did not have a need for sewer capacity at the time.

The Township Committee invited plaintiff to present "a conceptual plan" of its development project to the appropriate land-use board, adding "that the application would be conditioned on obtaining a suitable solution to wastewater." But given the Township's stated policy not to recapture sewer capacity, the presentation of that plan would have constituted an exercise in futility.  A developer may be hesitant to expend great sums of money to secure preliminary approvals for a development project that has no prospect of securing necessary sewer capacity.  Plaintiff can hardly be faulted for deciding that judicial relief was the only viable option.

Plaintiff identified the entities that were holding unused capacity and contacted approximately fifteen of those entities, inquiring whether they would relinquish some of their unused capacity.  The opposition to this lawsuit is the ultimate testament to defendants' unwillingness to freely give back any of their unused capacity.

The Appellate Division placed on plaintiff the burden of showing that defendant developers were acting "without good cause for delay" by not voluntarily surrendering their sewer

39

rights for the fair value offered by plaintiff. But that defeats the purpose of the ordinance and of the policy of the MLUL, which is to have the Township exercise its decision-making authority in land-use matters. One of the objectives of the sewer allocation ordinance was to ensure that the Township exercised discretion, when appropriate, to recapture unused capacity and to avoid "the improper delegation of access to the sewer system to private landowners who, by purchasing permits, could prevent other owners from developing their land." See First Peoples, supra, 126 N.J. at 420-21. The MLUL requires that townships exercise their authority to develop lands "in a manner which will promote the . . . general welfare," N.J.S.A. 40:55D-2(a), and the repurchase provision of the sewer allocation ordinance was a means to that end. We concur with the trial court that the Township's obligation to terminate agreements, when appropriate, was not dependent on whether plaintiff could "beg, borrow or cadge capacity from others." The Township's no-buy-back policy has rendered the ordinance toothless, and, as the trial court determined, "functioned as a de facto moratorium on any development which requires sewerage."

We substantially agree with the conclusions that Judge Buchsbaum reached from the summary-judgment record. In declining to recapture unused sewer capacity for plaintiff's project, the Township in its resolution incorporated by

40

reference, wholesale and uncritically, the arguments of the developer defendants. That approach suggests that the Township had effectively delegated its land-use authority to private entities. The resolution failed to analyze development by development why none of the unused capacity -- after years of lying idle -- could be recaptured.

The resolution also failed to analyze which developments, if any, fall under the dictates of the Permit Extension Act, N.J.S.A. 40:55D-136.1 to -136.6. The Permit Extension Act tolls the expiration date of certain land-use approvals for a period of time "due to the present unfavorable economic conditions." N.J.S.A. 40:55D-136.2(m). The Act covers "an agreement" between a developer and municipality "for the use or reservation of sewerage capacity." N.J.S.A. 40:55D-136.3. Admittedly, the Permit Extension Act would take precedence over an ordinance and therefore might limit the Township's discretion.

Last, and most significantly, the resolution did not give a "reasoned explanation" for the Township's failure to exercise discretion, as required by its own ordinance. The Township and defendant developers cannot contract away their obligation to comply with the law -- whether it is First Peoples, the MLUL, or the Readington sewer ordinance. Private parties do not have a right to hoard unused sewer capacity indefinitely and therefore effectively impose a moratorium on development. As a best

41

practice, we suggest that the Township maintain updated records of the unused capacity held by private parties so that it can exercise its discretion, when necessary, with current information.  In addition, a property owner seeking capacity should have access to data that is necessary to making an informed decision whether to proceed with a development plan.

We adopt the thoughtful approach taken by Judge Buchsbaum. We order the Township Committee, within ninety days, to undertake a critical review of the unused capacity identified by plaintiff and to determine whether any such capacity can be recaptured from defendants to satisfy plaintiff's development needs.  The Committee should consider the factors outlined earlier to guide the exercise of its discretion.  We add that if a property owner, presently holding a substantial amount of unused capacity, has moved its business operations to another municipality and there is no realistic prospect that approvals previously acquired will result in a project coming to fruition, that factor must be given significant weight in deciding whether to recall capacity.

Last, we address when a party has a sufficient stake to purchase unused capacity.  Needless to say, the Township should not recapture unused sewer capacity from one party and allow its sale to another party that is unlikely to put that capacity to use in the near future.  A party that has received preliminary

42

site plan approval obviously will have a stake in requesting capacity, but we are loath to impose that as the necessary test because of the significant costs involved in securing such an approval.  Here, the Township offered plaintiff the opportunity to present a concept plan to the appropriate board.[6]  If such a plan is satisfactory, and assuming that sufficient unused capacity is available, then the Township could commence the process of recapturing capacity at plaintiff's expense and hold that capacity in escrow, contingent on plaintiff securing all necessary approvals.  If plaintiff does not secure the necessary approvals, then the Township can sell that capacity to another developer that needs it for an imminent project, or resell it to the original owner.

VI.

For the reasons given, we affirm the Appellate Division's judgment upholding the trial court's dismissal of plaintiff's

---

[6] The concept plan suggested by the Township resembles the informal review available under N.J.S.A. 40:55D-10.1.  A planning board is permitted to conduct "an informal review of a concept plan for a development for which the developer intends to prepare and submit an application for development."  N.J.S.A. 40:55D-10.1.  An applicant can "benefit from the exchange of ideas and expression of the board's preferences" without having to "expend[] the significant amounts of money required in the preparation of development plans and applications."  36 New Jersey Practice, Land Use Law § 13.10 (David J. Frizell & Ronald D. Cucchiaro) (3d ed. 2014).  However, importantly, neither the board nor the applicant are bound by the discussions.  N.J.S.A. 40:55D-10.1.  An applicant must still proceed through the ordinary approval process.

facial challenge to the Readington Township sewer allocation ordinance.  We reverse, however, the Appellate Division's judgment rejecting the trial court's determination that the ordinance, as applied, violates principles espoused in First Peoples.  The Township Committee shall undertake a critical review of the unused capacity identified by plaintiff and determine within ninety days whether any capacity can be recaptured to satisfy plaintiff's development needs.  We remand to the trial court for proceedings consistent with this opinion.


     CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE ALBIN's opinion.  JUSTICE LaVECCHIA and JUDGE CUFF (temporarily assigned) did not participate.

44

# SUPREME COURT OF NEW JERSEY

NO.    A-63                    SEPTEMBER TERM 2013

ON CERTIFICATION TO     Appellate Division, Superior Court


388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

     Plaintiff-Appellant,

          v.

TOWNSHIP OF READINGTON, ET AL.,

     Defendants-Respondents,

          and

MERCK SHARP & DOHME CORP.,
f/k/a MERCK & CO., INC.,

     Defendant-Respondent,

          and

RAMYZ TADROS, ET AL.,

     Defendants.


DECIDED         May 5, 2015
            Chief Justice Rabner            PRESIDING

OPINION BY          Justice Albin

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | -------------------- | -------------------- |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | -------------------- | -------------------- |
| TOTALS | 5 | |