**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1826-18

388 ROUTE 22 READINGTON
REALTY HOLDINGS, LLC,

    Plaintiff-Appellant,

v.

TOWNSHIP OF READINGTON,
TOWNSHIP COMMITTEE OF
THE TOWNSHIP OF
READINGTON, SEWER
ADVISORY COMMITTEE OF
THE TOWNSHIP OF
READINGTON, BELLEMEAD
DEVELOPMENT
CORPORATION and
MERCK SHARP & DOHME
CORP.,

    Defendants-Respondents,

and

READINGTON COMMONS, LLC,
C. DEL VECCHIO, S. CARBONE,
A. CARBONE, ROLF ACKERMAN,
RAMYZ TADROS, SHADIA
SAMAAN, VALLEY NATIONAL
BANK, RYLAND DEVELOPERS,

LLC, LOT 3 DEVELOPMENT, LLC,
WHITEHOUSE ATHLETIC
ASSOCIATION, WLADYSLAW
ZACIOS, JOANN ZACIOS,
BETTY ANN COEBLER,
CODDINGTON HOMES, CO.,
INC., FALLONE PROPERTIES,
LLC, TOM JR. PROPERTY, INC.,
URB-FI DEVELOPMENT CORP.,
FALLONE AT SPRING MEADOW,
LLC, COUNTRY CLASSICS LEGACY
READINGTON, WPS REALTY,
LLC, WINFIELD MANAGEMENT,
NATIONAL REALTY AND
DEVELOPMENT CORP.,
SOMERVILLE ASSOCIATES, and
READINGTON HOLDINGS, L.P.,

     Defendants.

_____

Argued January 4, 2021 – Decided February 8, 2022

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0751-10.

Lawrence S. Berger argued the cause for appellant (Berger & Bornstein, LLC, attorneys; Lawrence S. Berger, on the briefs).

Richard P. Cushing argued the cause for respondents Township of Readington, Township Committee of the Township of Readington and Sewer Advisory Committee of the Township of Readington (Gebhardt & Kiefer, PC, attorneys; Richard P. Cushing and Kelly A. Lichtenstein, on the brief).

2

Glenn S. Pantel argued the cause for respondent Bellemead Development Corporation (Faegre Drinker Biddle & Reath LLP, attorneys; Glenn S. Pantel and Karen A. Denys, on the brief).

Christopher John Stracco argued the cause for respondent Unicom Science and Technology Park Inc. (Day Pitney LLP, attorneys; Christopher John Stracco and Jennifer Gorga Capone, on the brief).

Robert F. Renaud argued the cause for amici curiae New Jersey League of Municipalities and New Jersey Institute of Local Government Attorneys (Renaud DeAppolonio LLC, attorneys; Robert F. Renaud, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Plaintiff 388 Route 22 Readington Realty Holdings, LLC appeals from the August 24, 2018 order of the Law Division vacating on reconsideration a February 2, 2017 order that granted summary judgment to plaintiff on its claims under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, arising from the denial by defendant Township of Readington (Township) of plaintiff's request for sewer capacity to develop its property. The August 24, 2018 order also granted summary judgment to the Township and the two municipal entities through which it acted, defendant Township Committee of the Township of Readington (Township Committee) and defendant Sewer Advisory Committee

of the Township of Readington (Sewer Advisory Committee), collectively the Township Defendants, on plaintiff's NJCRA claims.

The February 2, 2017 order was based on the trial court's conclusion that the Township Defendants violated plaintiff's substantive right to develop its property free from an illegal development moratorium in violation of N.J.S.A. 40:55D-90(b). After granting reconsideration, the trial court abandoned its prior conclusion and found that N.J.S.A. 40:55D-90(b) does not create a substantive right for property owners within the meaning of the NJCRA.

We conclude that the trial court erred in its interpretation of the NJCRA on reconsideration and hold that N.J.S.A. 40:55D-90(b) creates a substantive right for property owners to develop their property free from an illegal development moratorium and that the denial of that right by municipal officials may form the basis of a claim under the NJCRA. Because the Township Defendants concede they are bound by a prior judicial determination that they maintained an illegal de facto development moratorium, and in light of our conclusion that plaintiff suffered harm as a result, we reverse the August 24, 2018 order, and reinstate the February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims.

A-1826-18

Because we reinstate the February 2, 2017 order granting summary judgment in favor of plaintiff on its NJCRA claims, we reinstate the trial court's January 12, 2018 order awarding plaintiff interim attorney's fees and costs under the NJCRA. The trial court entered a February 2, 2018 order directing immediate payment of those attorney's fees and costs to plaintiff. Plaintiff appealed both the trial court's March 19, 2018 order staying the February 2, 2018 order and its October 1, 2018 order denying reconsideration of the March 19, 2018 stay. We vacate the March 19, 2018 order and the October 1, 2018 order effective the latter of thirty days from the date of this opinion or resolution by the Supreme Court of any petition for certification filed in this matter.

Plaintiff also appeals from two February 2, 2017 orders of the trial court granting summary judgment to defendants Merck Sharpe & Dohme Corporation (Merck)[1] and Bellemead Development Corporation (Bellemead) on all claims asserted against them, as well as the trial court's November 16, 2018 order denying plaintiff's motion for attorney's fees and costs it alleges it incurred as a result of the Township Defendants' unreasonable delay in moving for

---

[1] In 2018, Merck (improperly pled as Merck & Co. Inc.) sold its property to Unicom Science and Technology Park, Inc. (Unicom). Merck assigned all of its rights, title, and interest in this appeal, as well as its unused sewer capacity, to Unicom. We refer to Merck in this opinion to avoid confusion.

reconsideration of the February 2, 2017 order concerning plaintiff's NJCRA claims. We affirm those three orders.

Finally, we vacate the trial court's November 16, 2018 final order, which provides that all of plaintiff's claims have been finally disposed. As a result of our conclusions with respect to the other orders on appeal, plaintiff's claims under the NJCRA remain partially unresolved. We remand this matter to the Law Division for further proceedings, including a determination of the damages and further attorney's fees and costs to which plaintiff is entitled on its NJCRA claims against the Township Defendants.

## I.

The material facts are not in dispute. In the late 1980s, the Readington-Lebanon Sewerage Authority (Sewerage Authority) expanded its plant capacity to allow for the treatment of an additional 320,000 gallons per day (gpd) of the Township's wastewater. The Township financed the expansion by offering landowners the option to purchase portions of the expanded sewer capacity for future development of their property.

In response to the offering, Merck, Bellemead, Ryland Developers, LLC (Ryland), and other defendants purchased future sewer capacity for the intended development of property they owned in the Township. Landowners purchasing

sewer capacity entered into a sewer expansion agreement with the Township that provided as follows:

> Should [the property owner] not begin construction on the aforementioned properties within two (2) years of the date of this agreement, then the Township shall have the option to terminate this agreement and all capacity assigned herein under shall be returned to the Township for reallocation at the discretion of the Township.

This provision of the sewer expansion agreement is consistent with an ordinance adopted by the Township to establish a methodology for allocating and recapturing sewer capacity. The ordinance provides in relevant part:

> B. Allocations for sewer capacity from Readington's allotted portion of sewer capacity shall be made by the . . . Township Committee upon written agreement to be entered into with the applicant, after the allocation request has been reviewed and a favorable recommendation has been made by the . . . Sewer Advisory Committee.
>
> C. In the case of those development projects which have not received an approval by the appropriate township board having jurisdiction at the time a request for gallonage is made, allocation agreements shall provide that if the applicant does not make formal application to the appropriate township board within two years of approval of the allocation, then the Township Committee may, in its discretion, terminate the agreement. If within two years after preliminary approval, construction has not commenced, the Township Committee may, at its discretion, terminate the agreement. The agreement may be extended upon

application to the Township if there is a showing of good cause, at the option of the Township Committee.

. . . .

E. Allocation of sewer capacity may not be transferred from the owner without prior approval of the . . . Township Committee, upon review and recommendation of the . . . Sewer Advisory Committee.

[Readington Twp. Code, § 187-26 (B), (C), (E).]

The ordinance also provides that any capacity not allocated through a sewer expansion agreement shall be allocated "[f]irst to those projects which will enable the Township to meet its future Mount Laurel affordable housing obligations[,]" and "[s]econdly, to remedy those properties within the sewer service area which constitute an 'emergency' due to failing septic systems." Id. at § 187-26 (A)(1)(a)-(b). The ordinance also permits the Township to reserve sewer capacity needed to meet Department of Environmental Protection reserve requirements. Id. at § 187-26 (A)(2). "[A]ll other requests for properties located within the sewer service area" are to be allocated sewer capacity "in the order received." Id. at § 187-26(A)(1)(c).

In December 2007, plaintiff purchased property in the Township. The property, which has a septic tank with a capacity of 2,000 gpd of wastewater, is

in the Sewerage Authority service area. The prior owner of the property did not invest in future sewer capacity when the Township expanded the treatment plant.

Plaintiff planned to develop the property with a restaurant and other businesses permitted by the zoning ordinance. The proposed project required wastewater capacity beyond that which can be handled by the existing septic system.

In March 2010, plaintiff applied to the Township Committee and the Sewerage Authority to connect its property to the sewer system and to be allocated 10,000 gpd of sewer capacity. As of that time, Merck held 146,900 gpd of unused sewer capacity it purchased to construct an approved, multi-phase office and headquarters project of nearly one million square feet, Bellemead held 66,060 gpd of unused sewer capacity it purchased for an approved multi-phase office development, and Ryland held 30,125 gpd of unused sewer capacity it purchased for the intended residential development of its property. Other defendants held smaller amounts of unused sewer capacity purchased during the expansion. The total unused sewer capacity held by property owner defendants constituted one third of the entire capacity assigned to the Township by the Sewerage Authority. In addition, the Township held 46,950 gpd of sewer

capacity in reserve for emergencies and 24,400 gpd of sewer capacity to meet its future affordable housing obligations.

None of the defendants holding unused sewer capacity had commenced development of their property to an extent requiring the use of all the capacity they purchased during the expansion. The Township, however, had not terminated any of the sewer expansion agreements.[2]

In its March 2010 application, plaintiff expressed its belief that the Township had sufficient unused sewer capacity to accommodate its request and, alternatively, suggested the Township Committee terminate sewer expansion agreements and buy back unused capacity from property owners who had not developed their property within the time permitted by the township ordinance and the agreements. The Township Committee denied plaintiff's request and stated that it did "not wish to terminate any of its existing sewer agreements."

Plaintiff subsequently appeared before the Sewer Advisory Committee, described the proposed development of its property, requested permission to connect the property to the sewer system, and requested allocation of 11,260

---

[2] For example, in 1988, Merck obtained preliminary site plan approvals for the project to be constructed on its property. The approvals were set to expire in twenty years. In 2008, the Township granted Merck a ten-year extension of its preliminary site approvals, and agreed that it would not seek to recapture Merck's unused sewer capacity until 2018.

A-1826-18

gpd of sewer capacity. The Sewer Advisory Committee chairman replied that as "we have told many other people who have come before us," all sewer capacity was either used or held by property owners and that the Township was bound by its sewer expansion agreements. He stated that "although the ordinance would allow for [it] if someone voluntarily wanted to . . . give up their capacity, the policy of this board and the policy of the Township Committee has been not to take any capacity back." He concluded that "there isn't a gallon literally that we have to give if we wanted to."

In September 2010, plaintiff appeared before the Township Committee requesting allocation of 11,260 gpd of sewer capacity. Although the Township Committee reiterated that the Township had a policy of not recapturing unused sewer capacity, during the meeting, the mayor said, "[w]hat I am thinking is why don't we like cut that off at the pass for the time being, have them explore it further, and maybe there will be a proposal for a development that the township would want to see on that site." This comment suggests that unused sewer capacity was available and the Township Committee was amenable to recapturing that capacity for a development project more to its liking than the one proposed by plaintiff.

A-1826-18

On or about October 15, 2010, plaintiff received a letter from the Township Committee stating that there was no unused sewer capacity available for plaintiff's proposed development. Neither the Sewer Advisory Committee nor the Township Committee made any inquiry, investigation, or analysis of whether any of the approximately 300,000 gpd of unused sewer capacity could be recaptured to satisfy plaintiff's request for 11,260 gpd of capacity.

On November 17, 2010, plaintiff filed a complaint in lieu of prerogative writs in the Law Division seeking an order compelling the Township Committee to recapture 11,260 gpd of unused sewer capacity for allocation to plaintiff. Plaintiff alleged a number of claims that, in effect, constitute facial and as-applied challenges to the Township's sewer capacity allocation ordinance, its policy of not recapturing unused sewer capacity, and its denial of plaintiff's request for sewer capacity.

After the parties cross-moved for summary judgment, the trial court remanded the matter to the Township Committee to "review the reasoning set forth in its prior rejection" of plaintiff's request for sewer capacity and to "provide a statement of reasons as a supplement to its decision."

On remand, after a hearing, the Township Committee again denied plaintiff's request, listing the reasons for its decision as: (1) the holders of

unused sewer capacity objected to the transfer of that unused capacity; (2) all excess capacity held by the Township was reserved for emergencies and affordable housing obligations; (3) the ordinance allowed the Township Committee to extend sewer expansion agreements for "good cause;" (4) several defendants have development approvals that fall under the protection of the Permit Extension Act (PEA), N.J.S.A. 40:55D-136.1 to -136.6, constituting good cause for an extension of their sewer expansion agreements; (5) the previous owner of plaintiff's property expressed no interest in purchasing sewer capacity at the time of the expansion; (6) the Township Committee did not believe it was "in the public interest to force the termination of . . . existing sewer agreements;" and (7) plaintiff had not determined whether the holder of any unused capacity had an "interest in voluntarily selling their capacity back to the Township."

After the remand, the trial court decided the parties' cross-motions for summary judgment. The court concluded the ordinance complied on its face with the holding in First Peoples Bank v. Twp. of Medford, 126 N.J. 413, 420-21 (1991), that a municipality must have an adequate recapture mechanism such that it does not delegate the exercise of its land-use authority to private parties by allowing them to purchase and hoard sewer capacity. The trial court reasoned

13

that the Township's ordinance provided sufficient mechanisms for the Township Defendants to recapture unused sewer capacity to permit development in the municipality.

On the other hand, the trial court held that the Township's application of the ordinance through a "'flat policy' of refusing to assert its right to recapture unused capacity . . . functioned as a de facto moratorium on any development which requires sewerage." The court found that such a moratorium is prohibited by N.J.S.A. 40:55D-90(b), a provision of the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, except in circumstances not germane here. The court also found the reasons given by the Township Committee for rejecting plaintiff's application were a "brushoff" of the remand order and held that the Township's obligation to administer sewer capacity was not dependent on whether a potential property developer like plaintiff could "beg, borrow or cadge capacity from others" who hold unused sewer capacity.

The trial court concluded the Township acted arbitrarily when it denied plaintiff's request because it did not provide a reasoned explanation, based on a development-by-development analysis, of why it decided not to exercise its discretion to recapture unused capacity from property owners subject to sewer expansion agreements who had not developed their properties. In addition, the

14

trial court determined the Township Committee did not apply the PEA to each development approval on parcels with unused sewer capacity to determine if an extension of the time period for use of sewer capacity was warranted. The court issued a writ of mandamus directing the Township Committee to review unused sewer capacity and provide a reasoned basis for not recapturing the capacity needed to develop plaintiff's property.

We subsequently affirmed the trial court's decision with respect to the facial validity of the ordinance, but reversed its conclusion with respect to the Township Committee's application of the ordinance. 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, No. A-0351-11 (App. Div. Sep. 4, 2013). Having concluded that the Township Committee did not abuse its discretion when it denied plaintiff's application for sewer capacity, we vacated the writ and dismissed plaintiff's complaint. Id. slip op. at 13.

On appeal, the Supreme Court agreed that the Township's ordinance was facially constitutional. 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 221 N.J. 318 (2015). With respect to the Township's application of the ordinance, however, the Court concluded that "Readington maintains a blanket policy of not repurchasing unused sewer capacity allocated to developers." Id. at 344. This policy, the Court held, "rendered the ordinance

15

toothless, and . . . functioned as a de facto moratorium on any development which requires sewerage." Id. at 346 (internal quotations omitted).

In addition, the Court concluded the Township Committee's failure to analyze which developments, if any, fall under the PEA and its failure to give a reasoned explanation for its denial of plaintiff's request rendered its decision arbitrary. Id. at 346-47. The Court agreed with the trial court's finding that when denying plaintiff's application "the Township in its resolution incorporated by reference, wholesale and uncritically, the arguments of the developer defendants. That approach suggests that the Township had effectively delegated its land-use authority to private entities." Id. at 346.

As a result of these conclusions, the Court affirmed the trial court's grant of summary judgment to plaintiff with respect to the Township Committee's arbitrary application of its ordinance. Id. at 348. The Court ordered the Township Committee "within ninety days, to undertake a critical review of the unused capacity identified by plaintiff and to determine whether any such capacity can be recaptured . . . to satisfy plaintiff's development needs." Id. at 347. To guide the Township Committee in applying the ordinance, the Court identified six factors to be considered when determining whether to recapture unused sewer capacity:

16

(1) the length of time a landowner has possessed unused sewer capacity, (2) the development plans of the landowner to tap some or all of the unused capacity and the imminence of that happening, (3) the complexity of the development project and the importance of the project to the community, (4) whether the economy has retarded economic development, (5) proposed development projects by others that cannot proceed because of unavailability of sewer capacity and the importance of those projects to the community, and (6) any other relevant factors.

[Id. at 343.]

The Court noted that

if a property owner, presently holding a substantial amount of unused capacity, has moved its business operations to another municipality and there is no realistic prospect that approvals previously acquired will result in a project coming to fruition, that factor must be given significant weight in deciding whether to recall capacity.

[Id. at 347.]

In January 2015, while this matter was pending in the Supreme Court, the Township Committee allocated 15,000 gpd of unused sewer capacity to defendants National Realty and Development Corp., Somerville Associates, and Readington Holdings, L.P. (collectively National Realty) for use at an existing Walmart shopping center in the Township. Of that amount, 12,000 gpd were intended to address an alleged potential failure of the septic system at the

17

shopping center and 3,000 gpd were designated for the future expansion of the Walmart. The allocation was not predicated on a pending or approved development application. When making this allocation, the Township gave itself the right to recapture the capacity transferred to National Realty should there be a change in the tenant of the shopping center, strongly suggesting that the existing tenant was favored by the Township Committee.[3]

On remand from the Supreme Court, the trial court ordered the Township Committee to consider plaintiff's application by undertaking a critical review of unused sewer capacity in conformity with the factors identified by the Court. The court ordered the Township to provide a detailed list of all other parties who applied for sewer capacity prior to plaintiff's application and were denied, given that they were, under the ordinance, "in line" for sewer capacity when it becomes available. The court ordered the Township to provide written notice to those parties of the remand proceedings.

The Sewer Advisory Committee, after holding public hearings, made separate recommendations to the Township Committee for each private holder of unused sewer capacity, suggesting the recapture of approximately 9,000 gpd

---

[3] As of February 2, 2017, more than two years after the allocation, the Walmart property had not been connected to the sewer system and the "failing" septic system remained in use.

from property owners who could not use capacity they held for a variety of reasons, such as the property in question was not in the sewer service area, was built to capacity, or was associated with a development proposal not permitted by the zoning ordinance. Those property owners consented to the recapture of their unused sewer capacity. The Sewer Advisory Committee did not recommend the recapture of any capacity from Merck, Bellemead, Ryland, or National Realty.

Notably, the recommendations did not include the recapture of capacity from Merck, even though the Sewer Advisory Committee determined Merck, which had constructed only a portion of its approved office development project, had moved its corporate headquarters from the Township to Union County and had no then-present intention of using the sewer capacity it held for the undeveloped phases of its project. The Supreme Court had previously held that such circumstances "must be given significant weight in deciding whether to recall capacity." 388 Route 22 Readington Realty, 221 N.J. at 347.

The Readington Township Planner testified that although Merck had moved its headquarters, maintaining the potential for continuation and expansion of its existing research and office facilities was critical to protecting jobs, future employment opportunities, and the Township's tax base. The Sewer

19

Advisory Committee noted that while Merck had abandoned its plans to build the second phase of its office development, it had executed a contract for the sale of its property and the purchaser intended to use sewer capacity to create inclusionary housing on the property, which was not then permitted by the zoning ordinance, and for which no proposal had been presented to the municipality.

After holding public hearings, the Township Committee adopted the recommendations of the Sewer Advisory Committee and recaptured and offered for sale to plaintiff 9,236 gpd of sewer capacity, none of which was from Merck, Bellemead, Ryland, or National Realty. The Township Committee adopted the Sewer Advisory Committee's rationale regarding Merck and noted that it would not recapture sewer capacity from Bellemead because plaintiff had "not provided any information to refute the conclusion that" the development of its property is not "of greater importance to the community than Bellemead's approved office development." The Township Committee determined that the proposed development of plaintiff's property would generate significantly less local property tax and create fewer jobs than the proposed development of Bellemead's property. Bellemead, however, had not built the second phase of its proposed office project "due to [the] complexity of the project and several

20

outside factors beyond its control, including the economy (a severely depressed market for office space)" and an intervening lawsuit. At the time the Township Committee made its decision, Bellemead was actively marketing its property because "trying to build a development to this scale on a speculative basis is not viable in this economy."

No property owner that had requested and been denied sewer capacity prior to plaintiff's application appeared at the public hearings. In addition, except for plaintiff's development proposal, the Sewer Advisory Committee and Township Committee did not consider whether there were proposed projects that could not proceed because of a lack of sewer capacity or the importance of any such proposed projects to the community. Plaintiff rejected the Township Committee's offer to purchase 9,236 gpd of capacity because it was insufficient for plaintiff's proposed development.

In October 2014, plaintiff filed an amended complaint, abandoning its facial challenge to the ordinance and alleging several new claims. Plaintiff alleged the Township Committee's refusal to recapture sewer capacity from Merck and Bellemead was arbitrary, capricious, unreasonable and in violation of the Supreme Court's remand order. In addition, plaintiff alleged that the Township Committee's allocation of 15,000 gpd to National Realty during the

21

pendency of the Supreme Court appeal was arbitrary, capricious, unreasonable, and without authority.

Plaintiff also alleged that the Township Committee's failure to recapture capacity from Merck and Bellemead and its allocation of capacity to National Realty violated plaintiff's equal protection, substantive due process, and civil rights in violation of the United States Constitution, New Jersey Constitution, 42 U.S.C.A. § 1983,[4] and the NJCRA, as well as constituted a taking of its property without just compensation or, alternatively, an inverse condemnation.[5]

Plaintiff requested the court: (1) order the Township Committee to recapture all of Merck's, Bellemead's, and National Realty's unused sewer capacities; (2) allocate 11,260 gpd of the recaptured sewer capacity to plaintiff; and (3) award plaintiff compensatory damages, punitive damages, attorney's fees, and costs under the NJCRA.

The parties cross-moved for summary judgment. On February 10, 2016, the trial court issued an oral opinion denying the motions. The court found that the Township Committee had not complied with the Supreme Court's directives

---

[4] The amended complaint alleges violations of 42 U.S.C.A. § 1981, which concerns racial discrimination. It appears the citation is a typographical error.

[5] Plaintiff alleged many of its claims on behalf of itself and all Township property owners who had previously requested and were denied sewer capacity.

on remand and that its recapture of sewer capacity was insufficient because no capacity was reclaimed from the largest holders, even though it was unlikely they would use the capacity they held in the near future. The court also found that Merck's retention of a "huge" amount of unused sewer capacity, despite its abandonment of its plans to construct the second phase of its office complex and its transfer of business operations to Union County, contributed to the continuation of a de facto moratorium on development in the Township.

The court also found, however, that plaintiff had not submitted a sufficient description of its development needs and noted that the "thrust" of the Supreme Court's decision was that the Township Committee must adequately determine whether to exercise its discretion to recapture sewer capacity to consider plaintiff's application, and not necessarily to award any recaptured sewer capacity to plaintiff.

In a March 9, 2016 order, the trial court again remanded the matter to the Township Committee to, among other things, recapture "at least a portion of unused sewer capacity" from Merck and Ryland within sixty days, to determine whether to recapture unused capacity from Bellemead, and to justify the grant of capacity to National Realty. The trial court also appointed a Special Master to assist the Township Committee with its review of unused sewer capacity.

23

On May 26, 2016, the Sewer Advisory Committee recommended recapturing 77,900 gpd of unused sewer capacity from Merck and 18,425 gpd of unused sewer capacity from Ryland. The Township Committee subsequently adopted the recommendation and recaptured a total of 96,325 gpd of unused sewer capacity from Merck and Ryland.

On October 31, 2016, Bellemead voluntarily tendered 11,260 gpd of its unused sewer capacity back to the Township, contingent on the court granting Bellemead's future motions "for final, unappealable summary judgment and severance" based on its tender of capacity. The Township agreed to reimburse Bellemead with interest for the capital contribution it previously paid for the sewer plant expansion that created 11,260 gpd in capacity.[6]

The parties cross-moved for summary judgment. On February 2, 2017, the court entered three orders. In the first, the court granted summary judgment in favor of plaintiff and against the Township Defendants on plaintiff's NJCRA claims. The court issued a written statement of reasons in which, after applying

---

[6] Bellemead disputes that plaintiff needed 11,260 gpd for the development of its property, based on concept plans produced by plaintiff during discovery to construct a fast-food restaurant, convenience store/gas station, and bank on the property. Bellemead alleges the proposed development would require no more than 3,059 gpd. Nevertheless, Bellemead tendered the full amount alleged by plaintiff, taking its allegations as true.

the three-part test established in <u>Tumpson v. Farina</u>, 218 N.J. 450, 473 (2014), it concluded plaintiff had a substantive right to develop its property in accordance with legal zoning, as well as a concomitant right to be free from an illegal development moratorium, the deprivation of which could form the basis of a claim under the NJCRA. The Court found that N.J.S.A. 40:55D-90(b) provided a "clear and unambiguous" conferral of a "substantive benefit" on property owners, which could readily be enforced by the judiciary.

In addition, the court concluded the Township Defendants, while acting under the color of State law, deprived plaintiff of these substantive rights by maintaining a de facto moratorium on development as a result of the Township Committee's refusal to comply with its ordinance and undertake an appropriate inquiry and reasoned consideration of the relevant factors identified by the Supreme Court to determine whether to recapture unused sewer capacity. The trial court rejected the Township's argument that plaintiff could not prove its rights had been deprived in the absence of proof that its development plans had been approved but were thwarted by the development moratorium.

In the second February 2, 2017 order, the trial court granted Bellemead's motion for summary judgment. The court issued a written statement of reasons in which it concluded Bellemead's voluntary tender of 11,260 gpd of its sewer

capacity to the Township Committee effectively mooted plaintiff's claims against Bellemead, as the tender is the maximum relief plaintiff could obtain from that party. To ensure plaintiff had the opportunity to obtain the relief it sought, the court directed the Township Committee to hold the capacity tendered by Bellemead for plaintiff for two years commencing on February 1, 2017, conditioned on plaintiff "diligently pursuing approval for its development proposal" by filing a complete development application within two years and obtaining approvals within an additional year.[7]

The court rejected plaintiff's argument that summary judgment in favor of Bellemead was not appropriate because the amended complaint sought to recapture all unused sewer capacity held by all defendants. Relying on the limited scope of the remand ordered by the Supreme Court, which directed the Township Committee to determine "whether any capacity can be recaptured to satisfy plaintiff's development needs[,]" 388 Route 22 Readington Realty, 221 N.J. at 348, the trial court concluded that the law of the case precluded plaintiff's demand for the recapture of all unused sewer capacity held by the defendants.

---

[7] At a subsequent case management conference the trial court indicated that it would entertain motions by plaintiff for an extension of those time periods. Plaintiff never made such a motion.

The court also rejected plaintiff's argument that the court and its Special Master should continue to oversee the allocation of sewer capacity in the Township.

Also on February 2, 2017, the trial court entered an order granting summary judgment in favor of Merck. The court issued a written statement of reasons in which it concluded that plaintiff's claims against Merck were rendered moot by Bellemead's voluntary tender of 11,260 gpd of sewer capacity. The court determined that the tender of capacity "broke[] the logjam" of sewer availability in the Township and provided sufficient capacity for the development of plaintiff's property.[8]

Plaintiff and the Township Defendants agreed to bifurcate the determination of plaintiff's damages under the NJCRA from the award of attorney's fees and costs under that statute. On January 12, 2018, the trial court

---

[8] Through entry of the orders concerning Bellemead and Merck, the trial court effectively granted summary judgment in favor of the Township Defendants on the allegations in the amended complaint concerning property owners other than plaintiff who were denied sewer capacity for proposed developments. The court concluded that the total 105,561 gpd of sewer capacity recaptured by the Township was nearly ten times the amount requested by plaintiff and more than sufficient for numerous other projects in the Township. The court speculated that because of the recaptured capacity there are few, if any, projects in the Township that cannot proceed because of a lack of available sewer capacity. The trial court also determined that any future applications for sewer capacity will be addressed on their own merits by the Township Committee and the services of the Special Master were no longer required.

A-1826-18

entered an order awarding plaintiff $989,076.63 in attorney's fees and costs incurred prior to March 31, 2017. The order did not set a date on which the Township Defendants were to pay the award. On February 2, 2018, the trial court ordered the Township Defendants to pay the attorney's fees and costs award immediately. The order also allowed plaintiff to apply for attorney's fees and costs incurred after March 31, 2017. On March 19, 2018, the court issued an order staying enforcement of the February 2, 2018 order.

Plaintiff subsequently moved for reconsideration of the March 19, 2018 order. While that motion was pending, the Township Defendants, after a change of counsel, on May 10, 2018, moved for reconsideration of the February 2, 2017 order granting summary judgment in favor of plaintiff on its NJCRA claims. Their moving papers raised arguments not made in opposition to plaintiff's original summary judgment motion.

On August 24, 2018, the trial court granted the Township Defendants' motion for reconsideration, vacated its February 2, 2017 order granting summary judgment in favor of plaintiff on its NJCRA claims, and granted summary judgment to the Township Defendants on those claims. Relying on what it described as a change in New Jersey law announced in Harz v. Borough of Spring Lake, 234 N.J. 317 (2018), the trial court concluded that N.J.S.A.

40:55D-90(b) did not contain the "rights creating language" necessary to support a cause of action under the NJCRA. The court found that the statute was intended only to regulate municipal conduct and did not confer substantive rights on any property owner. According to the trial court, while plaintiff may fall within the "zone of interest" of N.J.S.A. 40:55D-90(b), it was not given enforceable rights in the statute.

The court also rejected plaintiff's argument that, when read as a whole, the MLUL and its provision defining "interested party," N.J.S.A. 40:55D-4, vest property owners with the enforceable right to develop their property subject only to the limitations in the statute. Thus, the court concluded, plaintiff did not have a cause of action for damages under the NJCRA, as a result of the Township Defendants' maintenance of a de facto development moratorium.

The trial court also rejected plaintiff's argument that it had a cause of action under the NJCRA because the Township Defendants violated its substantive rights under the State Constitution to "acquire, possess and protect" its property, subject to the limitations in the MLUL. The court found that the arbitrary actions of the Township Defendants, while violative of N.J.S.A. 40:55D-90(b), did not "shock the judicial conscience" and did not, therefore, constitute a substantive due process violation under the State Constitution.

29

On October 1, 2018, the court denied plaintiff's motion for reconsideration of the March 19, 2018 order staying enforcement of the attorney's fee award.

Plaintiff subsequently filed a motion for attorney's fees and costs it incurred during the fifteen-month delay between issuance of the February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims and the filing of the Township Defendants' motion for reconsideration. Plaintiff alleged that it incurred significant attorney's fees and costs preparing its application for attorney's fees and costs after entry of summary judgment in its favor and preparing for the damages phase of the trial. It argued that these attorney's fees and costs would not have been incurred had the Township Defendants not engaged in an unreasonable delay in moving for reconsideration. Plaintiff alleged that the arguments raised in the Township Defendants' motion for reconsideration could have been raised at the time of the original motion for summary judgment or immediately after entry of the February 2, 2017 order.

On November 16, 2018, the court entered an order denying plaintiff's motion. While acknowledging that it had the inherent authority to require a party to reimburse another litigant for attorney's fees and costs in appropriate circumstances, the trial court concluded that such a sanction was not warranted here. Finding no evidence of bad faith or negligence on the part of the Township

Defendants, the court noted the change in counsel and the immediacy of the need to respond to plaintiff's motion for attorney's fees and costs, as reasonable explanations for the delay in moving for reconsideration.

Also on November 16, 2018, the court entered an order of final disposition concluding that all issues raised between the parties have been resolved.

This appeal follows. Plaintiff appeals: (1) the two February 2, 2017 orders granting summary judgment to Merck and Bellemead; (2) the March 19, 2018 order staying enforcement of the February 2, 2018 order directing immediate payment of the attorney's fees and costs awarded to plaintiff on its NJCRA claims; (3) the August 24, 2018 order granting the Township Defendants' motion for reconsideration, vacating the February 2, 2017 order granting summary judgment in favor of plaintiff on its NJCRA claims, and granting summary judgment to the Township Defendants on those claims; (4) the October 1, 2018 order denying plaintiff's motion for reconsideration of the March 19, 2018 order; (5) the November 16, 2018 order denying plaintiff's motion for an award of attorney's fees and costs arising from the Township Defendants' delay in moving for reconsideration; and (6) the November 16, 2018 final disposition order.[9]

---

[9] In October 2018, plaintiff filed for bankruptcy protection. The bankruptcy court appointed special counsel for the debtor estate to pursue this appeal.

We granted leave to the New Jersey State League of Municipalities and the Institute of Local Government Attorneys to participate as amici curiae.[10]

## II.

We review the trial court's decision granting summary judgment de novo, using "the same standard that governs trial courts in reviewing summary judgment orders." Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998). Rule 4:46-2(c) provides that a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." "Thus, the movant must show that there does not exist a 'genuine issue' as to a material fact and not simply one 'of an insubstantial nature'; a non-movant will be unsuccessful 'merely by pointing to any fact in dispute.'" Prudential, 307 N.J. Super. at 167.

Our review is "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523-24 (1995). We review legal issues, including the interpretation of statutes, de novo. In re Liquidation of Integrity Ins. Co., 193

---

[10] The Attorney General declined our invitation to participate in this appeal.

N.J. 86, 94 (2007) (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).

There are no genuine issues of material fact. We are presented, instead, with the legal question of whether the Township Defendants deprived plaintiff of a substantive right in violation of the NJCRA. We conclude that they did.

The NJCRA provides in relevant part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with . . . by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c).]

In addition to damages, the prevailing party may be awarded reasonable attorney's fees and costs. N.J.S.A. 10:6-2(f).

The Legislature modeled the NJCRA on the Federal Civil Rights Act, 42 U.S.C. § 1983, which establishes civil actions for the deprivation of federal constitutional and statutory rights. Tumpson, 218 N.J. at 474. That statute provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[42 U.S.C.A. § 1983.]

The NJCRA "is intended to provide what Section 1983 does not:  a remedy for the violation of substantive rights found in our State Constitution and laws." Harz, 234 N.J. at 330 (quoting Tumpson, 218 N.J. at 474).  See also Perez v. Zagami, LLC, 218 N.J. 202, 212 (2014) (holding that the NJCRA "was intended to address potential gaps in remedies available under New Jersey law but not cognizable under the federal civil rights law.").  The NJCRA's "broad purpose" is to "assur[e] a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection."  Owens v. Feigin, 194 N.J. 607, 611 (2008).

Unlike § 1983, however, the NJCRA does not apply to violations of procedural rights.  Harz, 234 N.J. at 330 n.4.  As the Court explained in Harz, "a substantive right is '[a] right that can be protected or enforced by law; a right of substance rather than form,'" whereas a procedural right is "[a] right that

34

derives from legal or administrative procedure; a right that helps in the protection or enforcement of a substantive right." Id. at 332 (quoting Black's Law Dictionary 1437, 1438 (9th ed. 2009)). Given the similarities between the statutes, federal precedents interpreting § 1983 are instructive when construing corresponding provisions of the NJCRA. Tumpson, 218 N.J. at 474.

Plaintiff has the burden of identifying both the substantive right of which it has been deprived and the State actor that caused the deprivation. Filgueiras v. Newark Pub. Schs., 426 N.J. Super. 449, 468 (App. Div. 2012). Both NJCRA and § 1983 provide a "means of vindicating substantive rights" created by State or federal Constitutions or laws, but they are "not a source of rights themselves." Gormley v. Wood-El, 218 N.J. 72, 97-98 (2014). They are not intended to create substantive rights, but rather to ensure a remedy for violations of existing rights. Tumpson, 218 N.J. at 474-75; Perez, 218 N.J. at 212. Thus, the NJCRA does not list the substantive rights, the deprivation of which may form the basis of a cause of action under the statute. Harz, 234 N.J. at 330. The Court has, however, recognized that the term "substantive right[s]" in the NJCRA "is broad in its conception." Tumpson, 218 N.J. at 474.

In Harz, the Court listed examples of "familiar" substantive rights that fall under the NJCRA, including: (1) "the 'unalienable rights' of '. . . acquiring,

35

possessing, and protecting property,' N.J. Const. art. I, ¶ 1; see also U.S. Const. amend. XIV; [and] . . . the right to not have private property taken for public use without just compensation, U.S. Const. amend. V"; (2) "[o]ther substantive rights . . . identified in our constitutional jurisprudence, such as: the right to privacy . . ." ; and (3) "other rights . . . conferred by statute."  234 N.J. at 332.

In order to establish a cause of action under the NJCRA for the denial of a substantive right created by statute, a plaintiff must satisfy the three-part test established in Tumpson, 218 N.J. at 475, and "recalibrate[d]" in Harz, 234 N.J. at 331.  Under Tumpson, a court must examine: (1) whether the statute on which an NJCRA claim is based was "intended to confer a 'benefit'" on the plaintiff; (2) whether "the statutory right . . . is not 'so vague [or] amorphous' that its enforcement would strain judicial competence; and (3)" whether the statute "unambiguously impose[s] a binding obligation" on the government actors.  218 N.J. at 475, 477 (alterations in original).

The Supreme Court refined the first prong of the Tumpson test in Harz. There, the Court explained: "Because our description of substantive rights in Tumpson may not be sufficiently precise, we use this occasion to provide additional guidance."  234 N.J. at 332.  The Court, applying the holding in Gonzaga Univ. v. Doe, 536 U.S. 273, 283-84 (2002), held that "it is rights, not

the broader or vaguer 'benefits' or 'interests,' that may be enforced under" the NJCRA, so the test is whether the Legislature intended to create a State right "enforceable by the person directly benefitted" by the statute on which an NJCRA claim is based. Id. at 331.

In Gonzaga, the Court clarified its precedents because some courts were "allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect . . . ." 536 U.S. at 283. The Gonzaga Court rejected this approach, emphasizing that a statutory violation was not an automatic civil rights violation under § 1983. Ibid. Instead, "whether a statutory violation may be enforced through § 1983 'is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute.'" Id. at 283 (quoting Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 508 n.9 (1990)).

The Gonzaga Court held that to confer a civil right enforceable under § 1983, a statute must use "'rights-creating' language critical to showing the requisite congressional intent to create new rights" or to impart an "'individual entitlement' that is enforceable under § 1983," plus the statute's text must unmistakably focus on the "persons benefitted" rather than the entity regulated. Id. at 284, 287. "But even where a statute is phrased in such explicit rights-

creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private <u>right</u> but also a private <u>remedy</u>.'" <u>Id.</u> at 284 (quoting <u>Alexander v. Sandoval</u>, 532 U.S. 275, 286 (2001)).

As a result of the refinement announced in <u>Harz</u>, the test for establishing whether a statutory right may form the basis of a cause of action under the NJCRA requires the court to determine:

> (1) whether, by enacting the statute, the Legislature intended to confer a right on an individual; (2) whether the right "is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) whether the statute "unambiguously impose[s] a binding obligation on the [governmental entity]."
>
> In addition to satisfying those three "factors," for purposes of our Civil Rights Act, plaintiffs must also "show that the right is substantive, not procedural."
>
> [<u>Harz</u>, 234 N.J. at 331-32 (alterations in original) (citing <u>Gonzaga</u>, 536 U.S. at 283-84, and quoting <u>Tumpson</u>, 218 N.J. at 475, 478).]

We turn, then, to N.J.S.A. 40:55D-90(b) to determine whether it creates a substantive right, within the meaning of the NJCRA. The statute provides in relevant part:

> b.     No moratoria on applications for development or interim zoning ordinances shall be permitted except in cases where the municipality demonstrates on the basis

A-1826-18

of a written opinion by a qualified health professional that a clear imminent danger to the health of the inhabitants of the municipality exists, and in no case shall the moratorium or interim ordinance exceed a six-month term.

[N.J.S.A. 40:55D-90(b).]

This statute is a component of the legislative delegation to municipal officials of the State's authority to regulate the development of land. "The Legislature has the constitutional authority to delegate to municipalities the 'police power' to enact ordinances governing 'the nature and extent of the uses of land," N.J. Const. art IV, § 6, ¶ 2, and the Legislature has done so through the passage of the" MLUL. 388 Route 22 Readington Realty, 221 N.J. at 339. The power delegated to municipalities is not unlimited. It instead "must be exercised for the general welfare[,]" id. at 339 (quoting S. Burlington Cnty. NAACP v. Twp. of Mt. Laurel, 67 N.J. 151, 175 (1975)), and is subject to the limitations imposed by the Legislature.

"Plans for the treatment of wastewater is a critical component of any development project, for without sewer approval no development project can go forward." 388 Route 22 Readington Realty, 221 N.J. at 343 (citing Field v. Mayor and Council of the Twp. of Franklin, 190 N.J. Super. 326, 328-35 (App. Div. 1983)). Here, the Supreme Court found the Township Defendants violated

N.J.S.A. 40:55D-90(b) by imposing a de facto moratorium on development by delegating to Merck, Bellemead, and other property owners effective control of the allocation of sewer capacity in the Township. 388 Route 22 Readington Realty, 221 N.J. at 346. The Court held that because the Township Committee refused to exercise its discretion to recapture unused sewer capacity without the consent of those property owners, it had, in effect, halted development in the Township, contrary to N.J.S.A. 40:55D-90(b). Ibid. The Township Defendants concede that the Supreme Court's finding on this point is the law of the case.

When considering whether the Township Defendants' violation of N.J.S.A. 40:55D-90(b) deprived plaintiff of a substantive right created by that statute within the meaning of the NJCRA, we are guided by two recent decisions concerning violations of statutory provisions regulating municipal authority over land use.

In Harz, a property owner asserted a claim under the NJCRA, alleging municipal officials deprived her of the substantive right found in N.J.S.A. 40:55D-72, a provision of the MLUL, to a hearing on her appeals of zoning permits issued to the owner of adjoining property. 234 N.J. at 327. The statute on which she relied provides:

> Appeals to the board of adjustment may be taken by any interested party affected by any decision of an

administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map. Such appeal shall be taken within 20 days by filing a notice of appeal with the officer from whom the appeal is taken specifying the grounds for such appeal. The officer from whom the appeal is taken shall immediately transmit to the board all the papers constituting the record upon which the action appealed from was taken.

[N.J.S.A. 40:55D-72.]

An "interested party" is defined as "any person, whether residing within or without the municipality, whose right to use, acquire, or enjoy property is or may be affected by any action taken under" the MLUL. N.J.S.A. 40:55D-4.

The plaintiff in Harz wrote to the municipal zoning officer expressing her belief that a permit he issued to an adjoining property owner authorized the construction of a home that did not comply with the zoning ordinance. 234 N.J. at 324. She requested the zoning officer transmit the papers constituting the record relating to the permit to the Planning Board, the body acting as the Board of Adjustment for her municipality. Ibid. Instead of transmitting the letter to the Planning Board, the zoning officer requested the adjoining property owner revise his construction plans to comport with the zoning ordinance. The zoning officer subsequently issued a second permit based on the revised construction plans. Ibid.

Harz forwarded a second letter to the zoning officer appealing the second permit. Ibid. The zoning officer transmitted the letter along with the record to the Planning Board. Id. at 325. Although the Planning Board scheduled a hearing, it was canceled when the municipal engineer determined that the revised construction plans did not comply with the zoning ordinance. The zoning officer thereafter rescinded the second permit and issued a third permit once construction plans were again revised. Ibid.

Harz filed an appeal of the third permit pursuant to N.J.S.A. 40:55D-72. After a three-day hearing, the Planning Board passed a resolution granting in part and denying in part the appeal. Ibid. The Planning Board rescinded the third permit until certain conditions were met. Ultimately the conditions were satisfied, and the zoning officer issued a fourth building permit. Harz did not appeal the fourth permit. Id. at 326. In the interim, Harz filed an action in lieu of prerogative writs seeking an order requiring the Planning Board to hold a hearing on her objections to the zoning permits.

After issuance of the fourth permit, Harz filed suit in the Law Division alleging the municipal officials deprived her of her substantive rights under the NJCRA. She alleged N.J.S.A. 40:55D-72 and N.J.S.A. 40:55D-70(a) conferred

A-1826-18

on her the substantive right to a hearing on each of her appeals challenging the issuance of permits by the zoning officer. Id. at 328.

The Supreme Court agreed. The Court found that "[t]he MLUL clearly conferred on Harz a right to be heard before the Planning Board on her appeal from the issuance of the zoning permit to her neighbor . . . ." Id. at 334. As the Court explained,

> [f]irst, Harz is an "interested party" under the MLUL because she resides within the Borough and the zoning officer's issuance of the permit to the neighbor "affected" her right to use or enjoy her property. . . . Second, N.J.S.A. 40:55D-72(a) provides an "interested party," such as Harz the right to appeal a zoning officer's decision to the Planning Board, acting as a board of adjustment. Third, on the filing of the appeal, the zoning officer was required to "immediately transmit to the [Planning Board] all the papers constituting the record." Ibid. Fourth, N.J.S.A. 40:55D-70(a) empowers a board of adjustment to "[h]ear and decide appeals" taken from an administrative officer, such as a zoning officer. Last, the Planning Board was required to render a decision on Harz's appeal within 120 days. N.J.S.A. 40:55D-72.
>
> [Id. at 334-35 (alterations in original).]

In addition, the Court found that the MLUL "'unambiguously impose[s] a binding obligation on the [Board]' to provide Harz with the opportunity to be heard." Id. at 335 (alterations in original) (quoting Tumpson, 218 N.J. at 475). "Last, because an interested party's right to be heard is inextricably tied to a

43

party's property rights, we find that the MLUL right to be heard is substantive, not procedural." Id. at 335.

> Here, the nature of the substantive right at issue – a property right – is clearly identifiable. The right of an interested party to appeal the issuance of a zoning permit – to have her concerns "heard" – is rooted in principles of property rights, specifically the right to not be deprived of an interest in one's property without process.
> [Id. at 333.]

After recognizing the existence of the substantive right established in N.J.S.A. 40:55D-72 and N.J.S.A. 40:55D-70(a), the Court concluded that "the Borough did not violate a substantive right as envisaged under the" NJCRA. Id. at 335. The Court noted that Harz had not been denied her right to file appeals from the permits, that construction on her neighbor's property ceased when her appeals were pending, and the three permits Harz appealed were rescinded. Id. at 335-36. As a result, even though the municipal officials had not strictly complied with the hearing requirement, Harz "suffered no adverseness to any property right she possessed." Id. at 336.

More recently, in Susko v. Borough of Belmar, 458 N.J. Super. 583 (App. Div. 2019), we affirmed a trial court decision that municipal officials violated the substantive rights of several plaintiffs within the meaning of the NJCRA

when they enacted an ordinance charging unreasonable beach fees contrary to N.J.S.A. 40:61-22.20.  That statute provides in relevant part:

> a.  The governing body of any municipality bordering on the Atlantic Ocean . . . which owns . . . lands bordering on the ocean . . . or easement rights therein, for a place of resort for public health and recreation and for other public purposes . . . may, in order to provide funds to improve, maintain and police the same and to protect the same from erosion, encroachment and damage by sea or otherwise, and to provide facilities and safeguards for public bathing and recreation . . . by ordinance . . . provide for the charging and collecting of reasonable fees for the registration of persons using said lands and bathing facilities, for access to the beach and bathing and recreation grounds so provided and for the use of the bathing and recreation facilities . . . .
>
> [N.J.S.A. 40:61-22.20(a).]

The statute was enacted to implement the public trust doctrine.  "The public trust doctrine refers to the common-law principle that a state holds, in trust for the people, ownership, dominion and sovereignty over tidally flowed lands extending to the mean high water mark."  Susko, 458 N.J. Super. at 590 (quotation omitted).  Under the doctrine, the public has the right to reasonable access to the trust lands.  Raleigh Ave. Beach Ass'n v. Atlantis Beach Club, Inc., 185 N.J. 40, 51-55 (2005).  The right of public access extends to "recreational uses, including bathing, swimming, and other shore activities."  Borough of

Neptune City v. Borough of Avon-By-The-Sea, 61 N.J. 296, 309 (1972).  "[O]ur courts have enforced the public trust doctrine by overturning actions favoring residents over non-residents with regard to access to and fees for using beaches and related facilities."  Susko, 458 N.J. Super. at 591.  For example, in Avon, the Court overturned an ordinance that restricted the sale of seasonal beach passes to residents, which resulted in non-residents paying disproportionally higher fees for daily and monthly passes.  Id. at 592 (citing Avon, 61 N.J. at 310).

N.J.S.A. 40:61-22.20(a) "amounts to a delegation to a municipality having a dedicated beach . . . of the state's police power over that area [that] indicates an affirmation of the state's paramount interest and inherent obligation in insuring that such . . . land be equally available for the use of all citizens."  Avon, 61 N.J. at 301-02.

Belmar Borough, the defendant in Susko, had previously been found by the Law Division to have violated the public trust doctrine by discriminating against non-residents through its beach fee schedule and by raising beach admission fees, rather than local property taxes, to pay for non-beach related expenses.  Id. at 592.  In 1989, the Law Division ordered Belmar to maintain a strict division of its revenue and expenses associated with beach access and

maintenance from its revenue and expenses associated with its general municipal operations.  Id. at 593.

After Super Storm Sandy caused extensive damage to Belmar's beachfront, the municipality "to avoid raising taxes on its residents . . . doubled the parking fees along the street adjacent to the beach, and paid certain non-beach-related litigation expenses using money from its beach fund instead of from its general fund."  Id. at 594.  Several plaintiffs filed suit alleging these measures violated the 1989 court order, the public trust doctrine, N.J.S.A. 40:61-22.20(a), and the NJCRA.  Ibid.

The record established that Belmar maintained no parking lot for people using the beach, requiring them to park on nearby streets, and did not charge for street parking anywhere in the municipality except for the street adjacent to the beach.  Id. at 599.  In light of these circumstances, we concluded it was reasonable for the trial court to find the beachfront parking fees were, in effect, beach access fees.  Id. at 600-01.  We affirmed the trial court's finding that the one-hundred percent rise in parking fees, the revenue from which the borough allocated to its general fund, was not imposed to pay for beach-related expenses, but intentionally and improperly to increase the borough's general revenues to avoid taxes on property owners.  Id. at 600.  We also concluded this practice

constituted the imposition of unreasonable beach fees in violation of N.J.S.A. 40:61-22.20. Id. at 601.

With respect to the plaintiffs' NJCRA claims, we found that N.J.S.A. 40:61-22.20's "statutory mandate that municipalities charge 'reasonable' beach fees states a substantive right of members of the public." Susko, 458 N.J. Super. at 608 (footnote omitted). We reasoned that "[i]t is a 'clearly identifiable" right, rooted in the historic and fundamental principle of public access to the beach." Id. at 608. Because the plaintiffs had paid the unreasonable parking fee, we found they had suffered a deprivation of a substantive right within the meaning of the NJCRA and were entitled to the award of attorney's fees and costs. Id. at 609.[11]

Applying the principles announced in these precedents, we conclude that N.J.S.A. 40:55D-90(b) creates a substantive right within the meaning of the NJCRA of property owners to develop their property free from an illegal development moratorium. As established in Harz, the MLUL, of which N.J.S.A.

_____

[11] In light of our conclusion that Belmar's violation of N.J.S.A. 40:61-22.20 deprived plaintiffs of a substantive right within the meaning of NJCRA, we did not reach a decision with respect to whether the public trust doctrine creates substantive rights protected by the NJCRA. Id. at 590. We rejected, for lack of sufficient proof, plaintiffs' claims that the borough charged unreasonable beach-badge fees and that N.J.S.A. 40:61-22.20 creates a substantive right to municipal compliance with certain accounting practices. Id. at 609.

40:55D-90(b) is a part, can be the source of substantive rights within the meaning of the NJCRA. We discern in N.J.S.A. 40:55D-90(b) a legislative intent to confer a substantive right to property owners. We recognize that the express terms of the statute regulate only municipal actions. However, it is evident that the purpose of the probation on development moratoria is intended to protect the rights of the property owners who have a fundamental right to develop their property consistent with zoning regulations.

N.J.S.A. 40:55D-90(b), like the provision at issue in Susko, represents a delegation of the State's police power to municipalities with respect to the regulation of land. That delegated power must be exercised by municipal officials consistent with the underlying public right it is designed to protect and the express limitations imposed by the legislature. The Legislature, in the delegation of its authority, prohibited development moratoria. Property owners are more than merely within the zone of those who benefit from the statute. The purpose of N.J.S.A. 40:55D-90(b) is to protect the rights of property owners to use their land by prohibiting municipal officials from abandoning their authority to allocate sewer capacity – an essential element of land development – by putting that authority in the hands of private parties. Because the right to be free

from illegal development moratoria is "inextricably tied" to a property right, it is substantive, not procedural.  See Harz, 234 N.J. at 335.

The substantive right protected by N.J.S.A. 40:55D-90(b) is neither vague nor amorphous.  The statute imposes an unambiguous binding obligation on municipal officials that is readily enforceable by the judiciary.  Each of the factors established in Harz is satisfied here.

The Township Defendants recognize that they are bound by the Supreme Court's conclusion that they violated N.J.S.A. 40:55D-90(b) and maintained an illegal de facto development moratorium when they denied plaintiff's application for sewer capacity without properly exercising their discretion as required by the Township's sewer allocation ordinance.  In addition, we find ample support in the record for the trial court's conclusion that after the Supreme Court's remand, the Township Defendants effectively continued their de facto development moratorium by failing to comply with the Supreme Court's remand order.

As explained in detail above, on remand the Township Defendants initially failed to recall any unused sewer capacity from Merck, Bellemead, or other holders of large amounts of unused capacity, despite undisputed evidence that they had not carried out the proposed development of their properties and

had no then-present intention of doing so. In addition, although it is undisputed that Merck had relocated its headquarters from the Township to Union County and did not intend to complete the approved second-phase of the development of its property, the Township Committee failed to give these circumstances "significant weight," as directed by the Supreme Court. 388 Route 22 Readington Realty, 221 N.J. at 347. The Township Committee also failed to consider any proposed development by a property owner, other than plaintiff, whose application for the allocation of sewer capacity was denied by the Township Defendants under their prior "policy" of refusing to consider the recapture of sewer capacity in violation of N.J.S.A. 40:55D-90(b).

The Township Defendants failed to recapture the capacity they allocated to National Realty while this matter was pending in the Supreme Court. Although the Township Defendants had told plaintiff that not a single gallon of capacity was available for the development of its property, the allocation to National Realty including 3,000 gpd for the expansion of an existing Walmart, exposed the falsity of that statement. Had the Township Defendants recaptured the 3,000 gpd they allocated to National Realty, that amount, when combined with the 9,236 gpd previously offered to plaintiff, would have been sufficient to satisfy plaintiff's request for 11,260 gpd for the development of its property.

We recognize that plaintiff ultimately succeeded in freeing sufficient sewer capacity to develop its property when Bellemead tendered 11,260 gpd of capacity to the Township for use by plaintiff. We do not find this development to be the equivalent of the circumstances in Harz, where the Court found that the plaintiff did not suffer a deprivation of her substantive right within the meaning of the NJCRA.

Harz's appeals to municipal officials were promptly addressed – perhaps, in Harz's view, too promptly because relief was granted to her without a hearing in several instances. Harz, 234 N.J. at 335-36. Here, municipal officials did not promptly address plaintiff's request for sewer capacity. To the contrary, they initially refused to exercise their discretion to determine whether to recapture unused sewer capacity consistent with their illegal policy of requiring the consent of the holders of capacity to any recapture. After plaintiff filed suit to compel the Township Defendants to consider its request for sewer capacity as required by the ordinance, they continued to maintain their de facto development moratorium by refusing to undertake a meaningful analysis of whether capacity should be recaptured from the property owners holding large amounts of unused capacity. Even after a remand from the Supreme Court, the Township Defendants did not meaningfully apply the factors the Court directed them to

consider when deciding whether to recapture unused sewer capacity, including the fact that Merck had abandoned its headquarters in the Township and no longer intended to develop its property. The record supports the trial court's conclusion that the Township Defendants repeatedly failed to comply with remand orders, frustrating plaintiff's right to pursue the sewer capacity it needed to develop its property as permitted by the zoning ordinance.

Unlike the property owner in Harz, plaintiff was compelled to spend years in litigation with the Township Defendants, expending significant time and resources to secure the substantive right granted to it by N.J.S.A. 40:55D-90(b). Although Harz also filed suit to compel municipal officials to hold a hearing, "[n]othing in the record suggests that had Harz not filed her action . . . the Planning Board would have denied her a hearing or that the . . . action was the catalyst for the hearing" that was ultimately held on Harz's appeal of the zoning permit. Id. at 337. There can be no doubt from the record that in the absence of plaintiff's long and costly suit, the Township Defendants would not have abandoned the de facto development moratorium they had maintained for decades and Bellemead would not have tendered sufficient sewer capacity to address plaintiff's development plans.

We reject the Township Defendants' argument that plaintiff cannot prove a deprivation of its substantive rights absent proof that it obtained approval of its development plans and was prevented from undertaking the development because of the Township's de facto development moratorium. The record establishes that plaintiff's attempt to obtain sewer capacity was frustrated for years by the actions of municipal officials – in maintaining a de facto development moratorium, in refusing to comply with court orders, and in failing to meaningfully exercise their discretion with respect to plaintiff's application for sewer capacity. There is sufficient evidence in this record to support the conclusion that plaintiff was harmed by the existence, maintenance, and prolongation of the Township's de facto development moratorium, even in the absence of fully approved, but unrealized, development plans for its property.

Amici argue that the Legislature did not intend the NJCRA to be a substitute for an action in lieu of prerogative writs, as the avenue for challenging municipal action or inaction under the MLUL. We do not agree with the proposition that the Legislature intended to preclude relief under the NJCRA for the deprivation of a substantive right by municipal officials where, as is the case here, a property owner may also obtain relief in a prerogative writs action based on the same misdeeds of the municipal officials.

54

A prerogative writs action is intended to correct inaction or improper actions of municipal officials. R. 4:69-1 to -7. The NJCRA, on the other hand, is intended to compensate parties for a past or ongoing deprivation of a substantive right by municipal officials under the MLUL. The NJCRA provides relief beyond that available in a prerogative writs action – damages and attorney's fees and costs – where the actions of municipal officials result in a deprivation of a substantive right created by a provision of the MLUL. We note that in Harz and Susko, the plaintiffs filed both a prerogative writs action and claims under the NJCRA. See Harz, 234 N.J. at 325; Susko, 458 N.J. Super. at 594.[12] In neither instance did the court find that the plaintiffs' ability to seek relief under the NJCRA was precluded by their filing of a prerogative writs action.

As is evident in the record, plaintiff's ultimate success at having 11,260 gpd of sewer capacity released for the potential development of its property does not compensate plaintiff for the damages it suffered during the prolonged period

---

[12] Although the opinion in Susko refers only to plaintiffs' having filed a complaint, we examined the record in the Susko matter and confirmed that the complaint was styled as an action in lieu of prerogative writs.

it was deprived of the opportunity to have its application for sewer capacity meaningfully considered by the Township Defendants.

We do not intend to hold that every violation by municipal officials of a provision of the MLUL supports an award of damages and attorney's fees under the NJCRA. Nor do we intend to suggest that the reversal on appeal of every decision of a zoning officer, board of adjustment, planning board, or other municipal official or body constitutes the deprivation of a substantive right within the meaning of the NJCRA. The determination of whether a provision of the MLUL creates a substantive right, the deprivation of which constitutes a violation of the NJCRA, requires a careful examination of the relevant provision of the MLUL, the intent of the Legislature when enacting that provision, and consideration of whether the actions of the municipal officials constituted a deprivation of that right and harmed the person asserting the right.[13]

The August 24, 2018 order is, therefore, reversed. The February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims against the Township Defendants is reinstated.

---

[13] In light of our holding, we do not reach the question of whether plaintiff established under the NJCRA a denial of its substantive due process rights under the State and federal Constitutions. Rezem Family Assocs., L.P. v. Borough of Millstone, 423 N.J. Super. 103, 114-15 (App. Div. 2011).

The Township Defendants did not cross-appeal from the January 12, 2018 order granting plaintiff attorney's fees and costs on its NJCRA claims for the period up to March 31, 2017. In light of our reversal of the August 24, 2018 order, the January 12, 2018 order is reinstated, as is the February 2, 2018 order requiring immediate payment of the amounts awarded in the January 12, 2018 order.

Plaintiff appealed both the March 19, 2018 order staying the February 2, 2018 order and the October 1, 2018 order denying reconsideration of the March 19, 2018 stay. We vacate the March 19, 2018 order and the October 1, 2018 order effective the latter of thirty days from the date of this opinion or resolution by the Supreme Court of any petition for certification filed in this matter.

We are mindful of the concerns raised by amici regarding the practical effect on municipal finances of large awards of attorney's fees and costs for violations of the NJCRA. They argue that application of the NJCRA to claims under the MLUL is bad public policy because municipal officials will be curbed in the exercise of their discretion by the threat of the potential monetary consequences of any misstep. It is the prerogative of the Legislature, not the courts, to balance the interests in compensating parties for the violation of their

substantive rights with the fiscal integrity of municipalities. The NJCRA represents the legislative determination of how that balance is to be struck.

In light of our reinstatement of the February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims, we remand this matter for a determination of plaintiff's damages and consideration of any application made by plaintiff for attorney's fees and costs for the period after March 31, 2017.

III.

We are not persuaded by plaintiff's arguments that the February 2, 2017 orders granting summary judgment to Bellemead and Merck should be reversed. We agree with the trial court's conclusion that Bellemead's tender of 11,260 gpd of sewer capacity conditioned on its transfer to plaintiff represents all of the relief plaintiff can obtain from Bellemead. The trial court took adequate measures to ensure plaintiff had a fair opportunity to use the 11,260 gpd of sewer capacity for the development of its property by insulating plaintiff from recapture for a two-year period to permit the submission of a complete development application, and an additional year to have the application approved. Plaintiff has secured the relief the Supreme Court contemplated when it remanded this matter to the Township Committee to determine "whether any capacity can be recaptured to satisfy plaintiff's development needs." 388 Route

22 Readington Realty, 221 N.J. at 347. Summary judgment was, therefore, appropriately granted to Bellemead. In addition, given Bellemead's tender of sewer capacity to plaintiff sufficient to satisfy its development needs, plaintiff is entitled to no further relief from Merck.[14]

While plaintiff seeks the court-ordered recapture of all unused sewer capacity held by all defendants, followed by ongoing judicial oversight of the Township's sewer capacity allotment practices, it cannot demonstrate an entitlement to such expansive relief. As discussed above, the Legislature delegated to municipal officials the discretion to recapture and allocate sewer capacity. We, like the trial court, see nothing in the record that would warrant the expansive court-ordered recapture of unused sewer capacity or the ongoing judicial supervision of municipal affairs sought by plaintiff.

As the trial court noted, in light of the Township having recaptured 77,900 gpd of unused sewer capacity from Merck, 18,425 gpd from Ryland, and 9,236

---

[14] There is no support in law for plaintiff's demand that Bellemead or Merck transfer sewer capacity directly to plaintiff. The ordinance unequivocally provides that holders of sewer capacity may not transfer capacity to other property owners. Allocation of sewer capacity rests in the discretion of the Township Committee, subject to the restraints established in legal precedents and the township ordinance. In addition, the record contains no evidence that plaintiff submitted a formal application for the development of its property or that it secured approval for the development. Transfer of sewer capacity to plaintiff would be premature in these circumstances.

gpd from other property owners, along with the capacity reserved by the Township to meet affordable housing obligations, there is an ample supply of unused sewer capacity to support development in the Township. We trust Township officials have conformed their policies and practices to the controlling legal principles governing the exercise of their discretion with respect to the recapture and allocation of sewer capacity. Of course, any property owner aggrieved by a decision of the Township Defendants with respect to the allocation of sewer capacity in the future may seek judicial relief as the need arises.

IV.

Our careful review of the record revealed no grounds on which to reverse the trial court's November 16, 2018 order denying plaintiff's motion for attorney's fees and costs associated with the Township Defendants' delay in moving for reconsideration of the February 2, 2017 summary judgment order.

We have recognized that, in some circumstances, a trial court has the inherent authority, independent of its authority granted under Rule 1:4-8, to award attorney's fees for unreasonable litigation conduct. See e.g., Triffin v. Automatic Data Processing, Inc., 394 N.J. Super. 237, 251 (App. Div. 2007) ("Separate and distinct from court rules and statutes, courts possess an inherent

power to sanction an individual for committing a fraud on the court."). However, "[e]ven assuming the existence of such an inherent power, it must be exercised with restraint and discretion because of its potency." Dziubek v. Schumann, 275 N.J. Super. 428, 439 (App. Div. 1994). "[T]he imposition of such a sanction is generally not imposed under this power without a finding generally that the attorney's conduct constituted or was tantamount to bad faith." Id. at 440.

We see no error in the trial court's conclusion that sanctions were not warranted because the delay in the Township Defendants' moving for reconsideration was attributable to a change of counsel and the necessity to address plaintiff's demand for immediate payment of the interim award of attorney's fees. The trial court acted well within its discretion when finding, in effect, that the Township Defendants did not engage in bad faith.

We also note that the February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims was interlocutory. "By definition, an order that 'does not finally determine a cause of action but only decides some intervening matter pertaining to the cause[,] and which requires further steps . . . to enable the court to adjudicate the cause on the merits[,]' is interlocutory." Moon v. Warren Haven Nursing Home, 182 N.J. 507, 512 (2005) (alterations in original)

(quoting Black's Law Dictionary 815 (6th ed. 1990)); see also Wein v. Morris, 194 N.J. 364 (2008).  Plaintiff's claims for damages, attorney's fees, and costs were unresolved at the time that the trial court entered the February 2, 2017 order granting summary judgment on plaintiff's NJCRA claims.

A trial court "has the inherent power, to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders at any time prior to the entry of final judgment."  Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257 (App. Div. 1987).  It was entirely appropriate for the Township Defendants to move for reconsideration of the February 2, 2017 order prior to entry of a final judgment by the trial court.

V.

After the parties filed their briefs, we granted Bellemead's motion to supplement the record with information establishing that on February 28, 2020, plaintiff's property was sold by order of the bankruptcy trustee.  SB Building Associates Limited Partnership (SB), the sole member and equity interest holder of plaintiff, challenged the validity of the sale, arguing that it was not sold "for value," as required by federal law.  On October 15, 2021, the Third Circuit affirmed the District Court's dismissal of SB's challenge as moot.  In re 388

Route 22 Readington Realty Holdings, LLC, No. 20-2629 (3d Cir. Oct. 15, 2021). The court subsequently denied a petition for en banc review.

After the sale of the property, Bellemead and Merck moved to dismiss as moot plaintiff's appeal of the trial court orders granting summary judgment in their favor. They argue plaintiff no longer has standing to assert its claims because it no longer holds title to the property. The Township Defendants joins the motion for the reasons argued by Bellemead and Merck, and also argues plaintiff, as a bankrupt corporation, does not have standing to continue this appeal.

Standing requires a plaintiff to have: (1) "a sufficient stake in the outcome of the litigation;" (2) "a real adverseness with respect to the subject matter;" and (3) "a substantial likelihood [of] suffer[ing] harm in the event of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002). Our courts "have traditionally taken a generous view of standing in most contexts." In re: State Contract A71188, 422 N.J. Super. 275, 289 (App. Div. 2011). "A financial interest in the outcome is sufficient to confer standing." EnviroFinance Grp., LLC v. Evt'l Barrier Co., LLC, 440 N.J. Super. 325, 340 (App. Div. 2015).

As explained above, Bellemead's tender of 11,260 gpd of sewer capacity for use by plaintiff mooted any further claims for relief from Bellemead and

Merck. On that ground, we affirmed the February 2, 2017 orders granting summary judgment in favor of Bellemead and Merck on all claims asserted against them. Their motion to dismiss the appeal is, therefore, dismissed as moot.

In addition, although plaintiff filed for bankruptcy protection, the bankruptcy court authorized it to pursue this appeal. Reinstatement of the February 2, 2017 order granting summary judgment to plaintiff on its NJCRA claims allows it to pursue damages, attorney's fees, and costs on remand. Any award plaintiff might achieve on remand will, presumably, inure to the benefit of its bankruptcy estate for distribution as directed by the bankruptcy court, as will the nearly one million dollars awarded to plaintiff in the January 12, 2018 order we reinstated.

While plaintiff's pursuit of sewer capacity may have been mooted by its loss of title to the property, the Township Defendants' violations of the NJCRA occurred while plaintiff held title to the property. Its subsequent loss of the property does not moot plaintiff's right to seek damages it suffered when the Township Defendants thwarted its intended development of the property. We, therefore, deny the Township Defendants' motion to dismiss this appeal for want of standing.

## VI.

To the extent we have not specifically addressed any of plaintiff's remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Because our decisions leave some of plaintiff's claims unresolved, the November 16, 2018 final disposition order is vacated.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION